## NIPPERT v. CITY OF RICHMOND.

No. 72. Argued November 8, 1945.—Decided February 25, 1946.

*Cornelius H. Doherty* argued the cause for appellant. With him on the brief was *Stanley H. Kamerow.*

*Horace H. Edwards* argued the cause for appellee. With him on the brief was *Henry R. Miller, Jr.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The question is whether a license tax laid by an ordinance of the City of Richmond, Virginia, upon engaging in business as solicitor can be applied in the facts of this case consistently with the commerce clause of the Federal Constitution, Article I, § 8. As the case has been made, the issue is substantially whether the long line of so-called "drummer cases"[1] beginning with *Robbins* v. *Shelby*

---

[1] See the authorities cited in *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33, 55–57, and the Court's discussion, particularly in note 11. As there stated, in the *Shelby County* case the Court was cognizant of the rapidly growing tendency of states and municipalities to lay license taxes upon drummers "for the purpose of embarrassing this

*County Taxing District,* 120 U. S. 489, shall be adhered to in result or shall now be overruled in the light of what attorneys for the city say are recent trends requiring that outcome.

The ordinance lays an annual license tax in the following terms:

"[Upon] . . .— Agents — Solicitors — Persons, Firms or Corporations engaged in business as solicitors . . . $50.00 and one-half of one per centum of the gross earnings, receipts, fees or commissions for the preceding license year in excess of $1,000.00. Permit of Director of Public Safety required before license will be issued. . . ."[2]

competition with local merchants," and following the *Shelby County* decision nineteen such taxes were held invalid.

For a discussion of distinction between drummers and peddlers, see Comment, 40 Yale L. J. 1094.

[2] Chapter 10, § 23, Richmond City Code (1939).

Chapter 10, § 166½ (a) reads: "Every person, firm and corporation desiring a license under sections 14, 16, 23, 94, 120 and 143, of this chapter shall first apply to the Director of Public Safety for a permit on behalf of said individual, firm or corporation, as the case may be, to conduct the business which is desired to be conducted and shall produce to that Director evidence of the good character of the individual, the members of the firm, or the chief officers of the corporation, as the case may be, and it shall thereupon be the duty of the Director of Public Safety to make a reasonable investigation of the character of said individual, each of the members of the firm, or each of the chief officers of the corporation, as the case may be, and if he be satisfied that the individual, the members of the firm or the principal officers of the Corporation, as the case may be, be of good moral character and a person or persons fit to engage in the proposed business, he shall issue the permit. The form of the application for such permit and the form of the permit itself shall be prepared and furnished by the Director of Public Safety."

Appellant has argued in this Court that the ordinance's requirements relating to permits, particularly in so far as they may vest in the Director of Public Safety discretionary power to grant or withhold the permit, of their own force and without reference to the char-

Appellant was arrested in Richmond for having engaged in the business of a solicitor there without previously procuring the required license. After hearing before a police court justice she was fined $25.00 and costs and ordered to secure a license. An appeal was noted to the Hustings Court of the City of Richmond, where a trial de novo was had upon the agreed statement of facts set forth in the margin.[3] The Hustings Court held the ordinance appli-

acter of the tax in other respects render it invalid in the present application. Appellee insists that the point was not presented in the state courts and therefore is not open for consideration here. In view of the disposition we make of the cause on other grounds, it is not necessary to consider these questions.

[3] "The American Garment Company, which is owned and operated by John V. Rosser, with its main office at 3617 12th Street, N. E., Washington, D. C., is engaged in the manufacture and sale of certain ladies' garments. The American Garment Company employs solicitors who travel from City to City throughout the country and obtain orders for this particular garment, which is sold for $2.98, and the solicitor receives from the purchaser a down payment usually sufficient to pay the commission of the solicitor, and the order is then sent to the home office of the American Garment Company and the garment is then sent through the United States mails C. O. D. for the balance to the purchaser. The solicitors at no time make a delivery of the article.

"The defendant herein was not and is not carried on the rolls of the American Garment Company as an employee and her sole compensation is the commission received from the sale of each article.

"The defendant, Dorothy Nippert, on January 20, 1944, was soliciting orders for the American Garment Company, as above set forth, in the City of Richmond, and that Dorothy Nippert had been engaged for four days prior to January 20, 1944, in going from place to place in the City of Richmond and in soliciting orders for the sale of merchandise on behalf of the American Garment Company and had, during that time, been engaged in going from place to place within the places of business of Miller & Rhoads, Incorporated, a large department store in the City of Richmond and within the place of business of one of the Five and Ten Cent Stores in the City of Richmond, and therein soliciting the Clerks in those stores so as to procure from

cable to appellant in the circumstances disclosed by the facts and was of the opinion that, so applied, it was not in conflict with the commerce clause. Accordingly the court found the appellant guilty and fined her five dollars and costs. The Supreme Court of Appeals of Virginia affirmed. 183 Va. 689, 33 S. E. 2d 206. From that judgment of the State's highest court the case comes here by appeal.

If the matter is to be settled solely on the basis of authority, nothing more is required than bare reference to the long list of drummer decisions, which have held unvaryingly that such a tax as Richmond has exacted cannot be applied constitutionally to situations identical with or substantially similar to the facts of this case. Among the latest of these is *Real Silk Hosiery Mills* v. *Portland,* 268 U. S. 325, in which a municipal ordinance requiring solicitors to pay a license fee was held unconstitutional as a forbidden burden upon interstate commerce when applied to an out-of-state corporation whose representatives solicited orders for subsequent interstate shipment. Cf. *Best & Co.* v. *Maxwell,* 311 U. S. 454.

Counsel for Richmond, however, insist that other cases decided here have seriously impaired the "drummer" line of authority, so much so that those rulings no longer can stand consistently with the later ones. Their principal reliance is on *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, in which the Court sustained the application of New York City's sales tax to the delivery there, at the end of its interstate journey, of coal shipped from Pennsylvania pursuant to contracts of sale previously made in New

those Clerks orders for the sale of merchandise on behalf of the American Garment Company, and that such solicitation occurred on the 20th of January 1944, and that she, the said Dorothy Nippert, had not there[to]fore procured a City revenue license from the City of Richmond."

York.[4]  It is urged that the case is indistinguishable from the present one on any tenable basis relating to the bearing or effect of the tax upon interstate commerce, although the opinion reviewed at some length the drummer cases, among others, and expressly distinguished them.[5]

Unless therefore this latest pronouncement upon their continuing authority is to be put aside with the cases themselves, the application made of the ordinance in this case must be stricken down.  For the tax thus laid is precisely the "fixed-sum license taxes imposed on the business of soliciting orders for the purchase of goods to be shipped

---

[4] Some reliance appears to be placed also upon other more recent cases, including *International Harvester Co.* v. *Department of Treasury*, 322 U. S. 340, and *General Trading Co.* v. *State Tax Commission*, 322 U. S. 335.

[5] Pointing out, with a reference to the *Shelby County* case itself, that in some of the cases the tax appeared to be aimed at the suppression of this type of business or putting it at disadvantage with competing intrastate sales, the opinion continued:

"In all [the cited cases], the statute, in its practical operation, was capable of use, through increase in the tax, and in fact operated to some extent to place the merchant thus doing business interstate at a disadvantage in competition with untaxed sales at retail stores within the state.  While a state, in some circumstances, may by taxation suppress or curtail one type of intrastate business to the advantage of another type of competing business which is left untaxed, . . . it does not follow that interstate commerce may be similarly affected by the practical operation of a state taxing statute. . . . It is enough for present purposes that the rule of *Robbins* v. *Shelby County Taxing District, supra,* has been narrowly limited to fixed-sum license taxes imposed on the business of soliciting orders for the purchase of goods to be shipped interstate . . .; and that the actual and potential effect on the commerce of such a tax is wholly wanting in the present case."  309 U. S. at 56–57.  In *Best & Co.* v. *Maxwell* the Court said: "In *McGoldrick* v. *Berwind-White Co.* . . . we pointed out that the line of decisions following *Robbins* v. *Shelby County* . . . rested on the actual and potential discrimination inherent in certain fixed-sum license taxes."  311 U. S. 454, 455, note 3.

interstate" which the *Berwind-White* opinion distinguished from the New York tax.[6]

But we are told that the rationale of the decision requires the distinction to be discarded. As counsel state it, this was "that the tax was imposed upon events which occurred within the taxing jurisdiction which events are separate and distinct from the transportation or intercourse which is interstate commerce."[7] The logic is completed by noting that the New York tax was upon the "local incident" of "delivery" while in this case it is on the like incident of "solicitation"; and by adding the contention, given more substance since the argument by our decision in *International Shoe Co.* v. *Washington,* 326 U. S. 310, that "mere solicitation" when it is regular, continuous and persistent, rather than merely casual, constitutes "doing business," contrary to formerly prevailing notions. Hence it is concluded, since the delivery in the *Berwind-White* case could be taxed, so can the solicitation in this case.

---

[6] See note 5. Whether or not the "fixed sum" reference would apply to a tax measured in part by gross receipts (cf. the language of the ordinance in this case relating to earnings, etc., in excess of $1000), the tax as applied here presumably would not involve that feature, since by the explicit wording it applies only to earnings, etc., "for the preceding license year" and there is no showing relating to such earnings in this case. See also note 7.

[7] Counsel cite the Court's statement made in differentiating *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, "The rationale of the *Adams Manufacturing Co.* case does not call for condemnation of the present tax. Here the tax *is conditioned upon a local activity,* delivery of goods within the state upon their purchase for consumption." 309 U. S. at 58. (Emphasis added.) However, the Court went on immediately to say, "It is an activity which, apart from its effect on the commerce, is subject to the state taxing power. The effect of the tax, even though measured by the sales price [cf. note 6 *supra*], as has been shown, neither discriminates against nor obstructs interstate commerce more than numerous other state taxes which have repeatedly been sustained as involving no prohibited regulation of interstate commerce." *Ibid.*

Appellee's rationalization takes only partial account of the reasoning and policy underlying the *Berwind-White* decision and its differentiation of the drummer authorities. If the only thing necessary to sustain a state tax bearing upon interstate commerce were to discover some local incident which might be regarded as separate and distinct from "the transportation or intercourse which is" the commerce itself and then to lay the tax on that incident, all interstate commerce could be subjected to state taxation and without regard to the substantial economic effects of the tax upon the commerce. For the situation is difficult to think of in which some incident of an interstate transaction taking place within a State could not be segregated by an act of mental gymnastics and made the fulcrum of the tax. All interstate commerce takes place within the confines of the States and necessarily involves "incidents" occurring within each State through which it passes or with which it is connected in fact. And there is no known limit to the human mind's capacity to carve out from what is an entire or integral economic process particular phases or incidents, label them as "separate and distinct" or "local," and thus achieve its desired result.

It has not yet been decided that every state tax bearing upon or affecting commerce becomes valid, if only some conceivably or conveniently separable "local incident" may be found and made the focus of the tax. This is not to say that the presence of so-called local incidents is irrelevant. On the contrary the absence of any connection in fact between the commerce and the state would be sufficient in itself for striking down the tax on due process grounds alone; and even substantial connections, in an economic sense, have been held inadequate to support the local tax.[8] But beyond the presence of a sufficient con-

---

[8] The latest instance decided here being *McLeod* v. *Dilworth Co.*, 322 U. S. 327.

nection in a due process or "jurisdictional" sense, whether or not a "local incident" related to or affecting commerce may be made the subject of state taxation depends upon other considerations of constitutional policy having reference to the substantial effects, actual or potential, of the particular tax in suppressing or burdening unduly the commerce.[9] Some of these at least were emphasized in the *Berwind-White* opinion.

Thus the Court, referring to the *Shelby County* line of decisions, stressed that "read in their proper historical setting these cases may be said to support the view that this kind of a tax is likely to be used 'as an instrument of discrimination against interstate or foreign commerce' . . ."[10] and that the tax "in its practical operation, was capable of use, through increase in the tax, and in fact operated to some extent to place the merchant thus doing business interstate at a disadvantage in competition with untaxed sales at retail stores within the state."[11] Noting that the State in some instances can suppress or curtail one kind of local business for the advantage of another type of competing business, the opinion denied that interstate commerce "may be similarly affected by the practical operation of a state taxing statute," and also denied that the New York tax had any such actual or potential effect.

Thus the essence of the distinction taken in the *Berwind-White* case was that the taxes outlawed in the drummer

---

[9] It is old doctrine, notwithstanding many early deviations, that the practical operation of the tax, actual or potential, rather than its descriptive label or formal character is determinative. See the authorities cited in note 23. The *Berwind-White* and other recent cases, including *Best & Co.* v. *Maxwell*, 311 U. S. 454, only bring that doctrine down to date. Cf. Lockhart, The Sales Tax in Interstate Commerce (1939) 52 Harv. L. Rev. 617, 621.

[10] 309 U. S. at 56, note 11; see note 5, *supra*.

[11] See note 6.

cases in their practical operation worked discriminatorily against interstate commerce to impose upon it a burden, either in fact or by the very threat of its incidence, which they did not place upon competing local business and which the New York sales tax did not create.[12]  See *Best & Co.* v. *Maxwell*, 311 U. S. 454; cf. *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359.

As has been so often stated but nevertheless seems to require constant repetition, not all burdens upon commerce, but only undue or discriminatory ones, are forbidden.[13]  For, though "interstate business must pay its way,"[14] a State consistently with the commerce clause cannot put a barrier around its borders to bar out trade from other States and thus bring to naught the great constitutional purpose of the fathers in giving to Congress the power "To regulate Commerce with foreign Nations, and among the several States . . ."[15]  Nor may the pro-

---

[12] See Lockhart, The Sales Tax in Interstate Commerce (1939) 52 Harv. L. Rev. 617, 621.

[13] Cf. *Postal Telegraph-Cable Co.* v. *Richmond*, 249 U. S. 252, 259; *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250, 254; *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33, 46; *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359.

[14] *Postal Telegraph-Cable Co.* v. *Richmond*, 249 U. S. 252, 259; *New Jersey Bell Telephone Co.* v. *State Board of Taxes*, 280 U. S. 338, 351.

[15] *Walling* v. *Michigan*, 116 U. S. 446, 455–458.  Thus, even the commerce in intoxicating liquors, over which the Twenty-first Amendment gives the States the highest degree of control, is not altogether beyond the reach of the federal commerce power, at any rate when the State's regulation squarely conflicts with regulation imposed by Congress governing interstate trade or traffic, *United States* v. *Frankfort Distilleries*, 324 U. S. 293, whether or not also in some instances in addition to complete exclusion from passing through the State, *Collins* v. *Yosemite Park Co.*, 304 U. S. 518, in the absence of such congressional action.  Cf. *Carter* v. *Virginia*, 321 U. S. 131, 137; *Ziffrin* v. *Reeves*, 308 U. S. 132, 140.

hibition be accomplished in the guise of taxation which produces the excluding or discriminatory effect.[16]

Appellee argues, as the Virginia Supreme Court of Appeals held,[17] that the Richmond tax is not discriminatory or unduly burdensome in effect. In support of this view it relies mainly on two contentions, first, that the tax is no more discriminatory or burdensome than was the tax in the *Berwind-White* case; and, second, that it applies alike to all solicitors whether they are engaged in soliciting for local or for interstate business. Apart from the fact that the tax as applied here is laid directly upon sales arising only under contracts requiring interstate shipment of goods, cf. 309 U. S. 48 ff., the contentions entirely misconceive what is meant by discrimination or undue burden in the sense applicable to these problems.

In view of the ruling in *International Shoe Co.* v. *Washington, supra,* we put aside any suggestion that "solicitation," when conducted regularly and continuously within the State, so as to constitute a course of business, may not be "doing business" just as is the making of delivery, at any rate for the purpose of focusing a tax which in other respects would be sustainable. But we do not think the tax as it was applied in this case either conforms to those conditions of regularity and continuity or avoids other prohibited effects.

The sales and the deliveries in the *Berwind-White* case were regular, continuous and persistent. They constituted a "course of business." There was no suggestion, nor any basis in the facts for one, that they were only casual, spasmodic or irregular. On the present record the

[16] Cf. *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 256; *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 522–523; *Best & Co.* v. *Maxwell,* 311 U. S. 454, 455, and authorities cited in note 3 therein.

[17] See, in addition to the instant case, *Dunston* v. *Norfolk,* 177 Va. 689, 15 S. E. 2d 86.

only showing is that appellant "on January 20, 1944, was soliciting orders" in Richmond, for later out-of-state confirmation and fulfillment, and that for four days prior to that date she had been engaged in such solicitation "from place to place in the City of Richmond," including particularly solicitation of the clerks in the department store of Miller & Rhoads, Incorporated, and in a five and ten cent store. There was no showing that, apart from these five days, appellant had solicited previously in Richmond, that she intended to return later for the same purpose or, if so, whether regularly and indefinitely or only occasionally and spasmodically.

This difference in the facts would be sufficient in itself to distinguish the cases. But there are other differences. The tax here was a fixed substantial sum for the first year, to which in subsequent years would be added one-half of one per cent of the gross returns in excess of $1000. And, regardless of the discretionary element in the issuing function of the Director of Public Safety, his permit was required with payment of the tax before the license could issue or the act of solicitation could lawfully take place, criminal sanction being prescribed for violation. So far as appears a single act of unlicensed solicitation would bring the sanction into play. The tax thus inherently bore no relation to the volume of business done or of returns from it. The New York sales tax, on the other hand, was limited to a percentage of the gross returns, being thus directly proportioned to the volume of business transacted and of returns from it. Although the seller was put under duty to pay the tax within a specified time from the sale, he was not required to obtain a permit or license beforehand in order to initiate or complete the transaction. Moreover the economic incidence of the tax fell only upon completed transactions, not as in this case on the very initial step toward bringing one about.

Obviously different therefore are the two taxes, first, in their exclusionary effects, especially upon small out-of-state operators, whether casual or regular; and also, it would seem clear, in discriminatory effects as between such operators and local ones of the same type or other competing local merchants. The New York tax bore equally upon all, whether local or out-of-state and whether making a single sale or casual ones or engaging continuously in them throughout the year. As the Court said, it is difficult to see how the New York tax could bear in any case more heavily upon out-of-state operators than upon local ones, apart from possible multiple state taxation or the threat of it such as, among other considerations,[18] was thought to forbid the levy and collection of the tax in *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307. The incidence of the tax was the same upon both types of transactions, as was its amount; and if in any instance there was exclusionary effect or tendency, this did not appear from the record or from the inherent character of the tax. Neither did any possibility appear that it would strike more heavily upon out-of-state sellers than on local ones, apart from that of multiple state taxation.[19]

---

[18] The Court said: "The vice of the statute as applied to receipts from interstate sales is that the tax includes in its measure, without apportionment, receipts derived from activities in interstate commerce; and that the exaction is of such a character that if lawful it may in substance be laid to the fullest extent by States in which the goods are sold as well as those in which they are manufactured. Interstate commerce would thus be subjected to the risk of a double tax burden to which intrastate commerce is not exposed, and which the commerce clause forbids. We have repeatedly held that such a tax is a regulation of, and a burden upon, interstate commerce prohibited by Article I, § 8 of the Constitution. The opinion of the State Supreme Court stresses the generality and nondiscriminatory character of the exaction, but it is settled that this will not save the tax if it directly burdens interstate commerce." 304 U. S. at 311–312.

[19] It should be noted that no question has been raised in this case concerning any issue of so-called "multiple state taxation." Cf. note 7.

In addition to that possibility, the Richmond tax imposes substantial excluding and discriminatory effects of its own. As has been said, the small operator particularly and more especially the casual or occasional one from out of the State will find the tax not only burdensome but prohibitive, with the result that the commerce is stopped before it is begun. And this effect will be extended to more substantial and regular operators, particularly those whose product is of highly limited or special character and whose market in any single locality for that reason or others cannot be mined more than once in every so often.[20]

The potential excluding effects for itinerant salesmen become more apparent when the consequences of increasing the amount of the tax are considered. Cf. *McGoldrick* v. *Berwind-White Co., supra,* at 58. And they are magnified many times by recalling that the tax is a municipal tax, not one imposed by the state legislature for uniform application throughout the State.

It is true that in legal theory the municipality exercises by delegation the State's legislative power and that prior decisions here have not rested squarely upon any difference between a tax municipally imposed and one laid by the legislature. But the cumulative effect, prac-

---

But if a nondiscriminatory state tax may become discriminatory or unduly burdensome by virtue of the fact that other States also may impose a similar tax bearing upon the transaction, the possibilities for such multiplication would seem obviously to be magnified many times by the application of municipal taxes like that involved here.

[20] The established merchant maintaining a local place of business where he deals in a variety of commodities, for instance, is much more favorably placed to absorb the cost of the tax than the itinerant vendor who deals in or takes orders for a single specialized commodity or only a few.

The record does not show whether appellant would have been compensated by the company for whom she solicits, had she paid the tax.

tically speaking, of flat municipal taxes laid in succession upon the itinerant merchant as he passes from town to town is obviously greater than that of any tax of state-wide application likely to be laid by the legislature itself. And it is almost as obvious that the cumulative burden will be felt more strongly by the out-of-state itinerant than by the one who confines his movement within the State or the salesman who operates within a single community or only a few.[21] The drummer or salesman whose business requires him to move from place to place, exhausting his market at each periodic visit or conducting his business in more sporadic fashion with reference to particular localities, would find the cumulative burden of the Richmond type of tax eating away all possible return from his selling. A day here, a day there, five days now and five days a year or several months later, with a flat license tax annually imposed lacking any proportion to the number or length of visits or the volume of the busi-

---

[21] The discriminations against solicitors constitute only part of the more general problem of interstate trade barriers. See Hearings before the Temporary National Economic Committee, 76th Cong., 2d Sess., Pt. 29; Melder, State and Local Barriers to Interstate Commerce in the United States (1937). But as to the different types of statutes and ordinances designed to favor local business as against itinerant solicitors and peddlers and "gypsy truckers," see Hearings, *supra*, 15965–15987 and Exhibit No. 2394 (not included in the printed Hearings); Gould, Legislative Intervention in the Conflict between Orthodox and Direct-Selling Distribution Channels (1941) 8 Law & Contemp. Prob. 318. One method used to discourage solicitors has been to require elaborate information. It is said that "In some New Jersey cities this method has reduced the number of canvassers by 35 per cent." 18 Public Management 83. And in Arizona at one time an itinerant trucker, who went through all the counties of the State, would have been obliged to pay $4,400 in fees in addition to posting a $5,000 bond. Hearings, *supra*, Ex. 2353. In addition, licensing statutes, otherwise fair on their face, are said to have been discriminatorily enforced against itinerant merchants. See Note (1940) 16 Ind. L. J. 247, 251.

ness or return, can only mean the stoppage of a large amount of commerce which would be carried on either in the absence of the tax or under the incidence of one taking account of these variations.

These effects, not present in the *Berwind-White* type of tax,[22] are inherent in the Richmond type in relation to a wide variety of selling activities. They are not only prohibitive in an absolute sense, for many applications. They are discriminatory in favor of the local merchant as against the out-of-state one.

It is no answer, as appellee contends, that the tax is neither prohibitive nor discriminatory on the face of the ordinance; or that it applies to all local distributors doing business as appellant has done. Not the tax in a vacuum of words, but its practical consequences for the doing of interstate commerce in applications to concrete facts are our concern.[23] To ignore the variations in effect which follow from application of the tax, uniform on the face of the ordinance, to highly different fact situations is only to ignore those practical consequences. In that blindness lies the vice of the tax and of appellee's position.

---

[22] The *Berwind-White* case furnishes an illustration that the difference between municipal and state-wide taxes may not be controlling or even relevant in relation to a tax which, apart from the possibility of multiple state taxation, presents neither the prohibitive consequences inherent in Richmond's tax nor any element of discrimination in favor of local business. The itinerant out-of-state merchant could pay the New York sales tax and survive, according to its general effect, without any disadvantage as compared with local merchants, itinerant or established, resulting from the tax, excepting only the possibility of multiple state taxation.

[23] Cf. *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 224, 227; *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 280; *Southern Pacific Co.* v. *Gallagher,* 306 U. S. 167, 177; *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444, 445; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359, 363, 366.

The tax, by reason of those variations, cannot be taken to apply generally to local distributors in the same manner and with like effects as in application to out-of-state distributors. The very difference in locations of their business headquarters, if any, and of their activities makes this impossible. This, of course, is but another way of saying that the very difference between interstate and local trade, taken in conjunction with the inherent character of the tax, makes equality of application as between those two classes of commerce, generally speaking, impossible.

It is true that the tax may strike as heavily upon some Virginia solicitors, and even upon some who confine themselves to Richmond, as it does upon others who come periodically or otherwise from Washington, New York or Cedar Rapids. And it may bear upon a few of the former more heavily than upon most of the latter. But neither consequence is the more probable one for the larger number of cases. The strong likelihood is the other way. And to point to either of those possibilities is only to say, in a different way, that the tax is highly variable in its incidence and effects with reference to the manner in which one organizes his business and especially in respect to its location and spread in relation to state lines. It was exactly these variations, when they bear with undue burden upon commerce that crosses state lines, which the commerce clause was intended to prevent.

We are not unmindful that large enterprise which "does business" by sending solicitors regularly and continuously into several States, cf. *International Shoe Co.* v. *Washington, supra,* may have the financial resources and established course of business enabling it to absorb the tax and justifying its doing so in an economic sense; or that, therefore, if the ruling should extend to such a situation, the business so situated would escape to that extent bearing the burden of the tax borne by local businesses similarly

situated, absent some other form of tax to equalize the burden. But, in the first place, no such case is presented by the facts here.[24] And even if such a result should be thought necessary in order to avoid the forbidden consequences in so many other applications, that fact would not justify sustaining the tax and permitting those consequences to occur.

There is no lack of power in the State or its municipalities to see that interstate commerce bears with local trade its fair share of the cost of local government, more especially in view of recent trends in this field. *McGoldrick* v. *Berwind-White Co., supra.* But this does not mean, and the trends do not signify, that the state or municipal governments may devise a tax applicable to all commerce alike, which strikes down or discriminates against large volumes of that commerce in order to reach other portions as to which the application of the tax

---

[24] Since appellant works for an out-of-state firm and the record contains nothing to show her presence in Richmond at any time other than during the one five-day period, or any intention to return, whether periodically or casually, no presumption can arise that she was a resident of Richmond or was regularly engaged in solicitation there. The presumption on the facts before us is the other way.

Moreover, here as in *Best & Co.* v. *Maxwell*, 311 U. S. 454, the "real competitors" of petitioner are, among others, the local retail merchants. The Richmond ordinance, unlike the North Carolina statute, does not discriminate on its face between such merchants and transient solicitors; nor does it fix a lower rate for the former. But the opinion in the *Best* case expressly pointed out that nominally the statute treated local and out-of-state transients alike. Nevertheless, since the latters' principal competition obviously came from "regular retail merchants" and the tax bore "no relation to actual or probable sales," the Court found the North Carolina atmosphere too hostile to allow survival of interstate commerce. The discrimination resulting from the present application of the Richmond ordinance, as between out-of-state solicitors and regular retail merchants, is only less obvious. It is not less real. Cf. note 5.

would produce no such consequences or only negligible ones. Other types of tax are available for reaching both portions which do not involve the forbidden evils or the necessity for putting them upon some commerce in order to reach other. The problem comes down therefore to whether the state or municipal legislative bodies in framing their taxing measures to reach interstate commerce shall be at pains to do so in a manner which avoids the evils forbidden by the commerce clause and puts that commerce actually upon a plane of equality with local trade in local taxation, not as is said to a question of whether interstate trade shall bear its fair share of the cost of local government, the benefit and protection of which it enjoys on a par with local business.

The tax here in question inherently involves too many probabilities, and we think actualities, for exclusion [25] of or discrimination against interstate commerce, in favor of local competing business, to be sustained in any application substantially similar to the present one. Whether or not it was so intended, those are its necessary effects. Indeed, in view of that fact and others of common knowledge, we cannot be unmindful, as our predecessors were not when they struck down the drummer taxes, that these ordinances lend themselves peculiarly to creating those very consequences or that in fact this is often if not always the object of the local commercial influences which induce their adoption. Provincial interests and local political power are at their maximum weight in bringing about acceptance of this type of legislation. With the forces behind it, this is the very kind of barrier the commerce clause was put in the fundamental law to guard against. It may be, as the Court said in the *Berwind-*

---

[25] Obviously a total exclusion of commerce is itself the most effective form of discrimination in favor of the local merchant who is so situated that he can continue in the business.

*White* case, that the State is free to allow its municipal subdivisions to erect such barriers against each other, to some extent, as to the commerce over which the State has exclusive control. It cannot so outlaw or burden the commerce of the United States.

The drummer is a figure representative of a by-gone day.[26] But his modern prototype persists under more euphonious appellations. So endure the basic reasons which brought about his protection from the kind of local favoritism the facts of this case typify.

We have considered appellee's other contentions and find them without merit.

The judgment is

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK dissents.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MURPHY concurs, dissenting.

The Court has not shared the doubts which some of us have had concerning the propriety of the judiciary acting to nullify state legislation on the ground that it burdens interstate commerce. See *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 784, 795, dissenting opinions. But the policy of the Court is firmly established to the contrary.

Even in that view, however, this judgment should not be reversed. The Court has held drummer taxes unconstitutional where they were discriminatory on their face or where it appeared that necessarily or in practical op-

---

[26] See, for the part played by itinerants in our history, Wright, Hawkers and Walkers in Early America (1927). Peddlers were discriminated against in favor of town merchants as early as 1700. Wright, *supra,* at 90.

eration they worked to the disadvantage of interstate commerce. See *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 45–46, note 2. But the present ordinance on its face seems to reflect no more than a *bona fide* effort to make interstate commerce pay its way. *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 254. It treats a solicitor for a Virginia manufacturer exactly the same as it treats solicitors for manufacturers located in other States. Under this type of tax, the solicitor for a Virginia manufacturer pays as much as Nippert, whether he confines himself to one locality or works his way through the State.

In that view a grant of immunity to Nippert is the grant of a preference to interstate commerce.

The problem, however, does not end there. *Best & Co.* v. *Maxwell,* 311 U. S. 454. In that case, a North Carolina tax on those who displayed goods in any hotel room or temporary office in order to obtain retail orders was applicable to solicitors representing local as well as out-of-state distributors. We held that that parity of treatment did not save the tax. We said that the tax must be compared with the tax on the local retail merchants— the "real competitors" of the out-of-state solicitor. Finding that the tax on the local retail merchants was lighter, we held that the tax discriminated against the out-of-state solicitor and was therefore invalid.

In the present case the tax on Nippert may or may not, in practical operation, work to the disadvantage of this interstate business. It would be one thing if Nippert's business took her from town to town throughout the State. But, so far as we know, Nippert may be a resident of Richmond working exclusively there, full or part time. In that event, we could not determine the issue of discrimination without knowing what taxes the retail merchants in Richmond must pay. If the facts were known, it might appear

that the tax, now struck down, in fact resulted in parity of treatment between Nippert and her local competitors. The record does not enlighten us on any of these matters.

I think that one who complains that a state tax, though not discriminatory on its face, discriminates against interstate commerce in its actual operation should be required to come forward with proof to sustain the charge. See *Southern Railway Co.* v. *King*, 217 U. S. 524, 534–537. This does not, of course, require proof of the obvious. But, as Mr. Justice Brandeis pointed out, cases of this type should not be decided on the basis of speculation; the special facts and circumstances will often be decisive. *Hammond* v. *Schappi Bus Line*, 275 U. S. 164, 170–172. Without evidence and findings we frequently can have no "sure basis" for the informed judgment that is necessary for decision. *Terminal Railroad Assn.* v. *Brotherhood of Trainmen*, 318 U. S. 1, 8. That seems to me to be the case here. Proof should be required to overcome the presumptive validity of this local legislation as applied to Nippert.