149 N.J. Super. 294 (1977)
373 A.2d 717
TAXI'S INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
BOROUGH OF EAST RUTHERFORD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided March 3, 1977.
*298 Mr. Thomas J. Barrett, attorney for plaintiff.
Mr. Alfred A. Porro, Jr., attorney for defendant.
FOLLENDER, J.D.C., Temporarily Assigned.
In this proceeding in lieu of prerogative writs, plaintiff Taxi's, Inc., a New Jersey corporation, challenges the validity of Ordinance 1976-3, as amended, adopted by the governing body of defendant Borough of East Rutherford on March 4, 1976, the purpose of which is to license and regulate taxicabs operating on and along the streets of East Rutherford. The action was commenced by the filing of a verified complaint and order to show cause executed by the court on September 23, 1976. The order to show cause restrained trials on all summonses issued by East Rutherford for violation of the ordinance, pending determination of this case, although it did not prohibit the further issuance of summonses for alleged violations of the ordinance. As of the date of the trial on January 27, 1977, over 40 summonses and complaints had been issued to 25 different taxicab owners charging a violation of the ordinance for failure to obtain a taxicab owner's license, including seven citations issued to Taxi's.
The initial and primary question before this court is whether the requirement that a taxicab owner obtain a license for which a fee of $500 must be paid for the first taxicab and *299 $200 for each additional taxicab operated by any one owner in East Rutherford, as mandated by § 3B of the ordinance, is prohibitive, excessive and confiscatory. Although varying fact situations have brought this question to the attention of our courts previously, research fails to disclose a fact situation such as here, where the business activity sought to be licensed and regulated, transitory in character, is accorded the same governmental treatment without regard to whether the business situs is located within or without the municipal boundaries.
Overshadowing this controversy is the presence of the Sports Complex, a creature of the New Jersey Sports and Exhibition Authority (Authority), located in East Rutherford. The Complex presently consists of a football stadium, commonly known as Giants Stadium, having a seating capacity of 76,500 (during the 1976-77 season each Giant home game was a sell-out), and the Meadowlands Race Track, accommodating on the average some 12,000 to 20,000 persons each racing day. Large parking areas surrounding the facilities have been provided for the benefit of the throngs attending the various attractions. Access to the Complex may be had only by over-the-road motor vehicles, with traffic being fed into the area through the use of two main arteries, the New Jersey Turnpike and New Jersey State Highway 3.
East Rutherford's position is that the Complex has been located within its boundaries without its consent and, more importantly, that as a direct result of the Complex's location East Rutherford has suffered a substantial loss of tax ratables previously enjoyed. The borough further contends that although it derives no profit from the Complex activities, it has been forced to cope with ancillary problems created thereby, such as a substantial increase in all forms of motor vehicular traffic, crowd control and an increased crime rate. East Rutherford argues that it is entitled to make an appropriate charge for the extra-governmental costs thrust upon it by the unwelcomed Complex activities, the charge to attach to each of the specific business activities carried *300 on which require regulation. Finally, the borough maintains that the specific business activity conducted by taxicabs in the borough has increased by geometric proportions since the opening and continued operation of the Complex, and that its answer to the specific problem, the enactment of Ordinance 1976-3, as amended, entitled, "An Ordinance to License and Regulate Taxicabs and Taxicab Drivers in the Borough of East Rutherford", is reasonable, appropriate and necessary.
At trial Taxi's called its general manager, Harry Richart, as its sole witness. He testified that Taxi's is engaged in the business of ownership and operation of seven taxicabs for public hire, having its situs in the neighboring municipality of Hasbrouck Heights; that it serves a local area, solely intrastate, within a five-mile radius of Hasbrouck Heights which includes East Rutherford; Taxi's never has and does not now maintain any cabstands or other stations in East Rutherford or in any of the other municipalities which it serves, other than Hasbrouck Heights and Hackensack. Richart stated that Taxi's pays an annual taxicab ownership license fee of $5 for each taxicab to Hasbrouck Heights and a $50 annual owner's license fee for each of two taxicabs to Hackensack where it maintains a cabstand, and a license is not required in any of the other municipalities where it conducts its business. Taxi's fare structure is governed by that established by Hackensack  $1 for the first mile and 20¢ for each additional fifth of a mile as measured by the meter  there being no other rate schedule established by any of the other municipalities served by its taxicabs. The average received for each completed service amounted to $2.60 to $3.
Richart further testified that the usual practice followed by Taxi's while conducting business related to east Rutherford was to respond to telephone requests from a person or persons inside or outside of the municipality for transportation to a destination either inside or outside of the borough; that Taxi's averaged five or six calls a day, resulting in an *301 average of $15 a day gross business; that despite the passage of the ordinance on March 4, 1976 Taxi's continued to conduct its business in East Rutherford without incident until late September or early October 1976, when the Complex commenced its business operations.
After the opening of the Complex, although Taxi's business did not increase appreciably, it was frequently requested to respond to calls, a portion of which were received late at night, often from the police employed directly by the Authority, to accept passengers stranded at the race track, and Taxi's complied with those requests. At the same time Taxi's received a series of summonses alleging violation of Ordinance 1976-3 for failure to obtain a taxicab owner's license. Taxi's then made application for an owner's license, which was not issued because it refused to pay the license fee demanded, but it continued to provide service in East Rutherford until receipt of the seventh citation charging it with violation of the ordinance. Taxi's then ceased all business activity in East Rutherford pending the outcome of this litigation.
East Rutherford produced as witnesses Chief of Police Daniel Logatto, and Taxicab Inspector George Kallimanis. Logatto testified that he is familiar with the present taxicab activity in the borough and the impact of the same on the police department. He stated that the only increase in the workload on the police department has been in terms of record keeping and an occasional check on out-of-town cabs to ascertain whether they had in fact obtained the necessary owner's license. His testimony reveals that prior to the adoption of the ordinance the police department consisted of 26 regular employees, and at present the number is the same. Three special patrolmen are employed by the police department; however, they have been engaged pursuant to the Comprehensive Employment and Training Act (CETA) and their salaries are paid by the Federal Government under the federal aid program. Although these special patrolmen are authorized to perform all functions of regular members, their *302 duties are confined primarily to traffic, and they have been hired only on a year-to-year basis. Also, four civilian dispatchers were engaged before the opening of the Complex and are still regularly employed. Logatto further testified that the basic police duty in connection with the ordinance is to review each application received from the Taxicab Inspector, make a record check and fingerprint the applicant. To date only two taxicab owners have filed applications necessitating the required review and processing, and in connection therewith 3 1/2-4 hours have been spent in reviewing each application and completing the necessary police procedures, all of which work has been performed by a detective in the ordinary course of his employment. Chief Logatto further stated that the usual and necessary police protection at the Complex is provided by the New Jersey State Police and other security forces engaged by and under the control of the Authority, at its sole cost and expense.
Kallimanis testified that he is an accountant by trade, regularly employed on a full-time basis five days a week by American Totalizer Company located in Clifton, New Jersey, and that he possesses no special training in the field of inspection or repair of a motor vehicle. He described his duties as Taxicab Inspector to include the review of applications submitted for owner's and operator's licenses and to enforce the provisions of the ordinance. It is his function to supply the necessary forms to an applicant and to receive the same upon completion, which he then transmits to the police who in turn notify him of the results of their investigation. Kallimanis then inspects each vehicle in question for cleanliness and state of repair of the interior. He then forwards the application to the governing body, together with his recommendation for or against issuance of the license sought. Kallimanis testified that to date he has processed only two applications, each of which took approximately five hours to process, one application having been filed by the owner of a taxicab company located in Hasbrouck Heights having a *303 total of four taxicabs and the other by the owner of a taxicab company operating two taxicabs and having its principal place of business in East Rutherford. He stated that he spends approximately 20 hours a week in this employment, all of that time, other than that spent in reviewing applications as aforestated, in forcing the terms of the ordinance by making observations of taxicabs operating at taxicab stands provided at the Complex to ascertain whether there has been compliance with the ordinance, and thereafter attending municipal court sessions each Tuesday night in connection with summonses issued by him. Kallimanis testified that he had issued approximately 40 summonses to some 25 unrelated taxicab companies, all of which remained unheard at the time of trial. His testimony further revealed that upon the opening of the Complex approximately 50 taxicab companies had served the area, but that number has now been reduced to two. Additionally, he stated that although his remuneration set by the ordinance is $2,500, he has to date received only $1,250. Finally, he testified that plaintiff's application has never been accepted or rejected since, by reason of its refusal to pay the license fee demanded the application has not been processed to a conclusion.
The relevant sections of Ordinance 1976-3, as amended, reveal the legislative pattern intended thereby. Section 1A defines "taxicab" as any vehicle in the business of carrying passengers for hire, operating on any of the streets of East Rutherford and which accepts or discharges persons from points or places to points or places within and without East Rutherford. Section 2A declares that no person shall engage in the taxicab business or operate a taxicab upon the streets of East Rutherford without first having obtained a license for each taxicab. Section 3B establishes the annual fee for each taxicab owner's license or any renewal thereof at $500 for the first taxicab and $200 for each additional taxicab in the same ownership, for each year or portion thereof for which the license is issued or renewed. Finally, section 16 *304 states that any person violating any of the provisions of the ordinance shall upon conviction be punished for each offense by a fine not to exceed $500 or 90 days in the county jail, or both.
An analysis of the foregoing sections makes it abundantly clear that the ordinance affects with equal force any operator of a taxicab in East Rutherford without regard to whether the basis of its business activity is centered within the municipal borders.
It is a well-settled rule that municipal ordinances are presumed valid. Hudson Circle Servicenter, Inc. v. Kearny, 70 N.J. 289, 296 (1976); Hutton Park Gardens v. West Orange Town Council, 68 N.J. 543, 564 (1975); Collingswood v. Ringgold, 66 N.J. 350, 358 (1975). The presumption is not irrebuttable but it imposes a burden on the party seeking to overturn the ordinance. Hudson Circle Servicenter, Inc. v. Kearny, supra, 70 N.J. at 298; Hutton Park Gardens v. West Orange Town Council, supra, 68 N.J. at 564; Collingswood v. Ringgold, supra, 66 N.J. at 358. While it has been said that the presumption may be overcome only by a clear showing that the local ordinance is arbitrary or unreasonable, Hudson Circle Servicenter, Inc. v. Kearny, supra, 70 N.J. at 299; Vickers v. Gloucester Tp. Com., 37 N.J. 232, 242 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963); Kozesnik v. Montgomery Tp., 24 N.J. 154, 167 (1957); Berkeley Tp. Bd. of Health v. Johnson, 73 N.J. Super. 384, 391-392 (App. Div. 1962), it is equally true that the presumption of validity referred to is only a presumption and may be overcome or rebutted, not only by clear independent evidence but also by a showing on its face, or in the light of facts of which judicial notice can be taken, of transgression of constitutional limits beyond the bounds of reason. Moyant v. Paramus, 30 N.J. 528, 535 (1959), Guill v. Hoboken Mayor and Council, 21 N.J. 574, 581 (1956); State v. Wittenberg, 50 N.J. Super. 74, 78 (App. Div. 1957), aff'd 26 N.J. 576 (1958).
*305 A municipality is but a creature of the State, capable of exercising only those powers granted to it by the Legislature. Wagner v. Newark Mayor and Council, 24 N.J. 467 (1957). The right to operate a taxicab is a franchise, and without doubt the State has the right to control the issuance of taxicab franchises and to regulate the conduct and the duties of the holders of the same. However, the State has elected to delegate that power to the municipalities. Naseef v. Cord, Inc., 90 N.J. Super. 135, 140 (App. Div. 1966), aff'd 48 N.J. 317 (1966).
The authority to regulate and license taxicabs is vested in a municipality by virtue of the provisions of N.J.S.A. 48:16-1 et seq., 40:52-1 and 2.
N.J.S.A. 48:16-2 reads in pertinent part as follows:
No autocab shall be operated along any street in any municipality until the owner thereof shall obtain the consent of the elective governing body or member thereof having control of the public streets in the municipality.
N.J.S.A. 40:52-1 in pertinent part provides:
The governing body may make, amend, repeal and enforce ordinances to license and regulate: a. All vehicles used for the transportation of passengers, baggage, merchandise, and goods and chattels of every kind, and the owners and drivers of all such vehicles; ...
N.J.S.A. 40:52-2 provides:
The governing body may fix the fees for all such licenses, which may be imposed for revenue, and may prohibit all unlicensed persons and places and vehicles, businesses and occupations from acting, being used, conducted or carried on; impose penalties for violation of ordinances providing for licenses, and revoke any license for sufficient cause and after notice and hearing.
The enabling legislation has its genesis in the vast reservoir of police power. In Salomon v. Jersey City, 12 N.J. 379, 390 (1953), Justice Jacobs, speaking for a unanimous court in interpreting the principles underlying the aforesaid *306 legislation, said it "was to authorize municipalities to license and regulate, as police measures for the public health, safety, morals or welfare, the local businesses described therein * * *." Accord, Weiner v. Stratford, 15 N.J. 295 (1954).
However, the legislative authority delegated to municipalities to license and regulate local businesses described in N.J.S.A. 40:52-1 and 2 under the guise of a proper exercise of police power did not vest unbridled authority in the municipalities to raise revenue. The power of taxation, a basic right of government, is vested in the Legislature and municipalities have no comparable power; nor is such a power vested in municipalities by virtue of the provisions of N.J.S.A. 40:52-2. Salomon v. Jersey City, 12 N.J. 379 (1953); Bellington v. E. Windsor Tp., 17 N.J. 558 (1955); Moyant v. Paramus, 30 N.J. 528, 543 (1959). A municipality may not, under the enabling legislation, pass a valid ordinance for revenue purposes only, but it may exact a fee commensurate with the cost of regulation and even in excess thereof if within reasonable limits. Salomon v. Jersey City, supra, 12 N.J. at 390; Bellington v. E. Windsor Tp., supra, 17 N.J. at 565; Moyant v. Paramus, supra, 30 N.J. at 547. Where the primary objective is to regulate pursuant to the police power, a reasonable license fee to defray the cost of said regulation does not constitute an attempt to raise revenue pursuant to the general taxing power. Bellington v. E. Windsor Tp., supra, 17 N.J. at 565. Salomon v. Jersey City, supra; Moyant v. Paramus, supra. See Note, 11 Rutgers L. Rev. 703.
The issue, restated here, is whether the annual license fee of $500 initially and $200 secondarily, chargeable to taxicab owners, is in accordance with the aforesaid accepted principles of law as a reasonable exercise of the regulatory municipal authority or whether the fee sought is an exactment beyond proper limits of the municipal power, thereby rendering the ordinance void.
*307 East Rutherford contends that the "special impact approach" enunciated in Nelson Cooney & Son, Inc. v. South Harrison Tp., 57 N.J. 384 (1971), is controlling and vindicates the position of defendant. There a municipality by ordinance charged an annual license fee to the operator of a mobile home park and a monthly fee for each mobile home space. The validity of the ordinance was attacked on the grounds that it represented an impost for revenue purposes and far exceeded any reasonable excess over the cost of regulation. In upholding the validity of the ordinance our Supreme Court scrutinized the reasoning set out in Bellington v. E. Windsor Tp., supra, and its progeny stating:
The true rationale of this line of cases is that when a business, subject to regulation and license under N.J.S.A. 40:52-1, by reason of its presence and operation in a community, has a special impact on local government and its finances, not otherwise adequately met by any ad valorem property tax levied upon it, the fee charged for the license may be fixed at any appropriate figure commensurate with, and which does not within reasonable limits exceed, the added governmental burden of that impact as well as the costs of regulation. Such a fee is a valid excise within the "for revenue" authority of N.J.S.A. 40:52-2 and, in the unique case of mobile home parks, may be imposed under the statute in the first instance upon the park operator, who by the establishment of his business has brought the burden into and upon the community, even though it is realistically intended and expected to be the ultimate obligation of his tenants, the mobile home owners. It is an appropriate means of collecting their proper and just contribution to the costs of local government, the benefits of which they enjoy. [at 393-394; emphasis supplied].
To like effect, see Garden State Racing Ass'n v. Cherry Hill Tp., 42 N.J. 454 (1964).
With the "special impact" thesis advanced by defendant this court cannot agree. An essential underlying fact threaded through the entire line of cases which apply the "special impact" approach is that the business activity sought to be regulated and licensed have clearly recognizable presence within the borders of the municipality, thereby *308 justifying the imposition of the fee upon those who by virtue of their continuing business operations, are the ultimate recipients of benefits conferred and provided by local government and for which the municipality does not otherwise derive adequate compensation in exchange for the burdens imposed. What is demanded is that those who are beneficiaries of municipal services bear their fair share of the cost incurred by the municipality in regulating the operation of and providing municipal services necessary and incident to the conduct of the particular business. The amount of the impost for revenue is substantiated and determined by aggregating the cost of regulation together with the additional burden or "special impact" thrust upon and assumed by local government.
But that rationale has no applicability to the facts here. The ordinance under attack does not limit itself to those taxicab operators who may be located within East Rutherford. As a matter of fact, the ordinance makes no distinction between taxicab operators who are regularly located in the borough and those who are not. East Rutherford argues that the advent of the Complex has brought about greatly increased taxicab business activity which, in turn, has elevated the cost of government. The argument falls short. Evidence is lacking that there has been any rise in the municipal budget or that if there be such an increase, it is due in whole or even in part to the activities conducted by taxicab operators located outside East Rutherford and who may, on occasion, venture into the municipality in pursuit of a transitory business engagement. Chief Logatto candidly admitted that there has been no significant increase in police activity as a result of the additional taxicab activity in the borough, and that increased taxicab operations in the borough have in no way created an added burden on the police force. The Complex itself is policed by persons in the employ of the State of New Jersey or the Authority. Regulation of the taxicab industry has not necessitated the hiring of additional police personnel or *309 appreciably increased the workload of the existing members of the local police department. Likewise, the Taxicab Inspector performs on only a part-time basis and spends practically all of his employment hours in enforcement of the ordinance, although that power is not specifically vested in him by the ordinance.
East Rutherford's argument that its failure to recover to date the salary of the Taxicab Inspector, as mandated by the ordinance, from prospective applicants constitutes a "special impact" is specious and without merit. In the first instance, it is admitted that to date the inspector has received only $1,250 of his reported $2,500 annual salary, while $2,000 in license fees actually have been collected.[1] Secondly, the "special impact" complained of by the municipality here does not focus on services normally provided by defendant, but rather upon an arbitrary salary figure set by ordinance. This is a bootstrap argument. East Rutherford having fixed the Taxicab Inspector's salary, contends that the salary in and of itself constitutes a "special impact," admittedly self-created. This "catch-22" type reasoning cannot be utilized to underpin an argument in favor of special impact; the burden complained of is clearly illusory. Finally, the very paucity of applications for a taxicab owner's license (only two out of a possible 50), coupled with the testimony of Kallimanis that he has spent only a total of ten hours in executing the licensing procedures dictated by the ordinance, is illustrative of a lack of significant impact upon the municipality.
Although it is arguable that the over-all operations of the Complex have had a noticeable special impact upon East Rutherford generally, there is no proof that the specific operation *310 of taxicabs in the borough have been a contributing factor.
In the absence of "special impact," consideration of the issue requires a determination as to whether the ordinance can be sustained as an authorized and proper revenue-raising measure incident to regulation of the business activity sought to be controlled. Salomon v. Jersey City and Bellington v. E. Windsor Tp., supra. In Bellington (sustaining an ordinance to license and regulate trailer camps and camp sites within the municipality) the holding in Salomon was distinguished and limited, the court stating as follows:
Here, we have a fundamentally regulative ordinance in the undoubted exercise of the police power to an essential public end, levying also a tax for revenue as an incident of the regulation, and so a tax, complementing the license fee proper, that is legally sufficient if it be reasonably related to the value of the public services and facilities afforded the users of the regulated areas and the benefits of the regulations themselves and the consequent governmental supervision and control; and thus a correlated exercise of both the police and the taxing powers conformably to the statutory grant.
The quantum of the fee of necessity depends upon the nature and circumstances of the regulated category. The tax concept may be expressed in terms of the duty of the sharers of the benefits of government to bear its burden equitably and justly. * * *
But the tax may not be prohibitory or confiscatory; and it is urged that the "charge is so high as to have the effect of prohibiting persons from conducting a legitimate business," and so "prohibitory," citing Gurland v. Town of Kearny, 128 N.J.L. 22 (Sup. Ct. 1942), and converting a "legitimate business profit into a substantial deficit," and thus "confiscatory," as in Hoffman v. Borough of Neptune City, 137 N.J.L. 485 (Sup. Ct. 1948). [17 N.J. at 566-567]
An element for consideration is the fee charged by neighboring municipalities. Moyant v. Paramus, supra; Gilbert v. Irvington, 20 N.J. 432, 435 (1956). From the testimony of Richart it is observed that Taxi's pays a license fee of only $5 per cab in Hasbrouck Heights, the situs of its business activity, and $50 per cab in Hackensack where it maintains a cabstand, even though in both municipalities its operations are of a much more permanent and frequent nature which should logically impose a far greater burden *311 upon government and should consequently result in the reasonable expectation that one requiring a license should be expected to pay a higher fee. By comparison, the license fee imposed by East Rutherford on any and all taxicab owners takes on huge proportions.
The proofs disclose that concomitant with the opening of the Complex to the public some 50 taxicab companies engaged in serving the site, but at the present time only two companies remain active in the area. East Rutherford contends that the foregoing statistic is evidence from which it should be inferred that the 48 taxicab companies which have ceased serving the Complex were "fly-by-nights" or "gypsy" type operations and that as a result of the enactment and enforcement of the ordinance the local operation of the industry has brought strict regulation, thereby benefiting the public. But this hypothesis is not founded upon evidence in the record. Richart testified that Taxi's had been forced to halt its regular business activity in East Rutherford because of the inhibiting effect of the ordinance and its unwillingness to pay the license fee. The only logical inference that can be drawn is that the other 47 companies which had been doing only a minimal or sporadic business ceased all service because they viewed the cost of doing business as measured by the license fee imposed to be prohibitive and were unwilling to face the prospect of punitive action prescribed by the ordinance.
The entire record discloses a relatively insignificant amount of time, effort and finances spent by East Rutherford in regulation of the taxicab business on the one hand, whereas, on the other, a license fee is sought which far exceeds not only the cost of regulation, but any reasonable excess thereof.
Measured by the facts and circumstances here presented the impost ordained is patently exorbitant and prohibitory in application; consequently the license fee is a legally impermissible attempt to raise revenue, violative of the spirit *312 and intent of N.J.S.A. 40:52-1 and 2 and unsustainable, thereby rendering the ordinance void. Salomon v. Jersey City and Bellington v. E. Windsor Tp., supra.
Aside from its fatal defectiveness as an improper revenue raising measure, the ordinance cannot stand because it unfairly discriminates between taxicab companies headquartered in East Rutherford and those which are not. That Taxi's may attack the license fees imposed by ordinance charging that they are unreasonable or discriminatory as applied to its business is not open to dispute. Belleville Chamber of Commerce v. Belleville, 93 N.J. Super. 392, 401 (App. Div. 1966), aff'd 51 N.J. 153 (1966).
The fundamental appeal of the taxicab is its unfettered mobility in a mobile-oriented society. It is common knowledge that a taxicab operator in the ordinary pursuit of his business will travel from one municipality to another in the given area he serves guided by the direction of his passenger. His business engagement is ordinarily of short duration and nonrepetitive. Yet the ordinance in assessing fees fails to distinguish between taxicabs quartered in East Rutherford and those operating in the municipality on a sporadic, transitory basis. The results are those which might reasonably be expected, with one exception  all nonresident operators have found the $500 and $200 license fees an insurmountable barrier and have refused to continue to provide taxicab service to the area. Thus the general public is adversely affected by the denial of a vital need, since the Complex is virtually inaccessible except by motor vehicles utilizing, in the main, connecting arterial State highways. Were successive municipalities in the specific area to levy flat fees or taxes of similar kind or amount upon the itinerant taxicab operator, there could be only one ultimate result  elimination of the taxicab as a viable means of transportation from one place to another. Such municipally-imposed flat fees have been struck down as discriminatory and an undue burden on interstate commerce in violation of the Commerce Clause of *313 the Federal Constitution, Art. I. Sec. 8, where the cumulative effect, viewed potentially, if imposed by successive municipalities would exceed any fee that could reasonably be imposed by the Legislature on a statewide basis. Nippert v. City of Richmond, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946); Duckworth v. Arkansas, 314 U.S. 390, 62 S.Ct. 311, 86 L.Ed. 294 (1941); Moyant v. Paramus, supra, 30 N.J. at 551-552; State v. Kromer, 34 N.J. Super. 465, 468 (Cty. Ct. 1955). And although the State is free to allow municipalities to erect barriers against each other affecting commerce over which it has exclusive control, even that power is limited. Nippert v. City of Richmond, supra. Such limitations have been recognized in later New Jersey decisions. Cf. Cresskill v. Dumont, 15 N.J. 238 (1954).
Although this court carefully recognizes that the fact situation here presented does not involve interstate commerce per se, this court refuses to blind itself to the inevitable involvement of that issue caused by the actual location of the Complex and its obvious and blatant appeal to prospective patrons not residents of New Jersey. The cogent reasoning of Nippert, supra, is adaptable to the fact pattern of this case and is adopted by this court. East Rutherford cannot erect a "Chinese wall" around its perimeter by municipal legislation, Cresskill v. Dumont, supra, for it unfairly discriminates in favor of local taxicab operators, as opposed to nonresidents, to the detriment of the total community.
Taxi's has challenged the ordinance as lacking proper standards, but in view of the decision reached here disposition of that issue is deemed unnecessary.
For the reasons stated, East Rutherford Ordinance 1976-3, as amended, is declared invalid.
NOTES
[1] It is worthy to note that if the remaining 48 of the 50 taxicab companies reported to be originally operating at the Complex immediately after its opening obtained a license for only one taxicab instead of ceasing all operations. East Rutherford would have received an additional minimum of $23,000 in fees in 1976.