**PITTSTON WAREHOUSE CORP.,**
**Plaintiff,**

v.

**The CITY OF ROCHESTER, Defendant.**

**CIV–80–479 C.**

United States District Court,
W. D. New York.

Dec. 18, 1981.

Lambos, Flynn, Nyland & Giardino, New York City (Alfred A. Giardino, New York City, of counsel) for plaintiff.

Louis N. Kash, Rochester, N.Y., Corp. Counsel for the City of Rochester (Michael J. Looby, Rochester, N.Y., of counsel), for defendant.

CURTIN, Chief Judge.

This case concerns the Pittston Warehouse Corporation's [Pittston] efforts to recommence shipping operations at the Port of Rochester and the City of Rochester's [the City] plans to redevelop the port and harbor into primarily a recreational area. The Port of Rochester is located within the boundaries of the City on the Genesee River, immediately south of where the river flows into Lake Ontario. Since the early nineteenth century, the port has been used for commercial activity, as a nexus for the transportation of goods on the Genesee River, and as a Great Lakes port, shipping and receiving international commerce.[1] In recent years, however, the port has declined in use, caused by changes in shipping patterns and the use of other modes of transportation. As a result, the last ship docked at the Port of Rochester in 1974.

The Pittston Corporation has leased the port from the City continuously since 1960, and under the terms of the lease, it is authorized to undertake docking, loading, and discharging of steamship vessels as well as related stevedoring, warehousing, and shipping operations. This lease between the parties generates approximately $61,500 a year in rent for the City.[2]

Despite the fact that the port received no ships in 1975, in December of that year Pittston renewed its lease with the City to continue shipping operations.[3] In 1978, with its renewed lease but no commercial shipping activity forthcoming, Pittston entered into conversations with two Canadian corporations, C N Marine Corp. and Rideau Shipping Co., Ltd., to explore the possibility of a new type of steamship service between Rochester and the Province of Ontario.

This new service would provide for transporting tractor trailer trucks from the Province of Ontario to Rochester by ship across Lake Ontario and is known as "rollon/roll-off trailer ship service." This type of service is not now used between the United States and Canada; however, this particular waterborne transportation route might prove economically feasible, stemming from the increased price of truck fuel. By saving highway transportation expenses, this water route may provide an alternative, less costly means for the transportation of goods between the two nations. Support for this concept also came from the United States Maritime Administration which authorized an economic evaluation of roll-on/roll-off trailer ship service that was completed in January of 1980. The evaluation report stated that a route between Toronto, Ontario, across Lake Ontario to Rochester represented the largest potential for trailer ship operations along the Great Lakes between the two countries.[4]

During the recent period of shipping inactivity, residents of the area surrounding the

1. *See Rochester Gas & Electric Corp. v. Federal Power Commission*, 344 F.2d 594, 596 (2d Cir. 1965), concerning the history of waterborne commercial activity and its use on the Genesee River.

2. Planning/Environmental Research Consultants, *Lower Genesee River Report*: prepared for the Department of Community Development, City of Rochester, August 1977, p. 43, Exhibit A; Freeland Affidavit submitted by Defendant, Document No. 20.

3. Pittston's 1975 lease includes two extensions of the lease, each for five-year periods at the tenant's option, *Lower Genesee River Report*, p. 43, Exhibit A; Freeland Affidavit submitted by Defendant, Document No: 20.

4. Booz, Allen & Hamilton, Inc., *Final Report*: An Evaluation of the Economic Feasibility of Great Lakes Trailer Ship Service for the United States Department of Commerce, Maritime Administration, January 1980. Exhibit C, Plaintiff's Motion for Partial Summary Judgment, Document No. 15.

port and the City of Rochester have been engaged in development plans to turn much of the port and harbor area into a recreational marine area. Pittston kept the City informed of its negotiations and plans for roll-on/roll-off trailer ship service, and with the impetus of the impending conclusion of these negotiations, various public meetings were held concerning the proposed shipping operations in the winter and spring of 1980. On April 8, 1980, representatives of C N Marine, Rideau Shipping, and Pittston attended a meeting of the Rochester City Council, where they explained their proposal for roll-on/roll-off trailer ship service.

At this same meeting and after this presentation, the City Council enacted three laws restricting commercial shipping operations in the harbor area. Resolution 80–22 authorized the City Manager to develop

zoning ordinances to "create a harbor district, in which the permitted uses will be those water dependent and commercial uses which will enhance the character as an attractive and recreational harbor." Ordinance 80–139 changed the zoning classification of the area from a manufacturing, open-space, and commercial harbor district to a "River-Harbor District," and included Pittston's leased port and harbor area within this new zone. Ordinance 80–140 defined the uses of the River-Harbor District and, in part, prohibited the port and harbor to be used for "(1) all manufacturing uses, (2) warehouse and distribution centers, (3) commercial cargo and shipping *terminals*," (emphasis in the original legislation). All of these enactments were to take effect immediately, and all were adopted by the City Council unanimously.[5]

---

5. Resolution 80–22 states in pertinent part:
    RESOLUTION ADOPTING THE LOWER GENESEE RIVER LAND USE PLAN AS AN AMENDMENT TO THE GENESEE RIVER PLAN OF 1969.
    Section 1. The Council hereby directs the City Manager to develop amendments to the Zoning District Map so that the land uses in the Lower Genesee River Corridor which are intended under the Lower Genesee River Plan will be encouraged.
    Section 2. The Council hereby directs the City Manager to develop an amendment to the text of the Zoning Ordinance in order to create a Harbor District, in which the uses permitted will be those water-dependent and commercial uses which will enhance the character of an attractive and active recreational harbor.
    Section 3. This resolution shall take effect immediately.
    Ordinance 80–139 states in pertinent part:
    AMENDING CHAPTER 115 OF THE MUNICIPAL CODE, ZONING ORDINANCE, BY CHANGING THE ZONING CLASSIFICATION OF THE GENESEE RIVER HARBOR AREA FROM AN M–1, C–3 AND O–S DISTRICT TO AN R–H DISTRICT.
    BE IT ORDAINED, by the Council of the City of Rochester, as follows:
    Section 1. Chapter 115 of the Municipal Code, Zoning Ordinance, as last amended, is hereby further amended by changing the zoning classification of the following-described parcel of land located in the Genesee River Harbor area from an M–1 Manufacturing District, C–3 Commercial District, and O–S Open-Space District to an R–H River Harbor District:
    R–H River Harbor District Map Amendment
        [DELETED]

    Section 2. This Ordinance shall take effect immediately.
    Ordinance 80–140 states in pertinent part:
    AMENDING CHAPTER 115 OF THE MUNICIPAL CODE, ZONING ORDINANCE, BY ADDING A NEW SECTION 115.72, R–H RIVER HARBOR DISTRICT, AND NEW PARAGRAPH 115.88- V.
    BE IT ORDAINED, by the Council of the City of Rochester as follows:
    Section 1. Chapter 115 of the Municipal Code Zoning Ordinance, as last amended, is hereby further amended by adding a new section 115.72, River Harbor District, to read as follows:
    Sec. 115.72. R–H River Harbor District.
    A. Purpose.
    The R–H River Harbor District is intended to preserve and enhance the recreational character of the harbor area at the mouth of the Genesee River, improve the visual quality of the harbor environment, preserve, retain, and promote public access to the shoreline, and encourage tourism in the area. While the primary uses of the area are boating and fishing, complementary commercial uses which enhance the recreational character of the area and provide conveniences for water-related and shoreline recreational activities are permitted. The development of additional public and private facilities for fishing, boating, swimming, dining, picnicking, strolling and sightseeing is encouraged. The review of development in this district is intended to promote the integration, intermingling, and visual and physical proximity of a variety of activities.
    \*    \*    \*    \*    \*    \*
    F. Prohibited Uses.
        1) All manufacturing uses.

Nevertheless, Pittston contacted the Rochester Director of Community Development by letter dated April 17, 1980, and announced the successful conclusions of negotiations necessary to undertake the trailer ship operations and the commencement of the transportation service in August of 1980. This letter was reviewed by the City Council, and in direct response, the Council enacted Ordinance 80–199 on May 13, 1980. This ordinance expressly prohibits the use of roll-on/roll-off trailer ship service at the Port of Rochester but ostensibly "does not prevent any port shipping of the type that had occurred historically until recent years." [6]

Pittston then filed this action in the United States District Court, which was initially dismissed for failure to state a cause of action by the late Honorable Harold P. Burke in September of 1980. On appeal, the United States Court of Appeals for the

Second Circuit reversed and remanded the case for further proceedings. Pittston now moves for partial summary judgment, claiming all four of these Rochester enactments are invalid under the United States Constitution.

The City of Rochester cross moves for summary judgment on the issues of Pittston's standing or whether a justiciable controversy has been presented by the enactment of Resolution 80–22, Ordinance 80–139, and Ordinance 80–140 (the River Harbor enactments) affecting Pittston, and the City defends all four enactments as permissible within the scope of the Constitution. The material facts are not in dispute, and all these cross motions for summary judgment are considered upon oral argument, as well as the complaint, answer, briefs, and supporting material submitted to the court.

Pittston attacks the Rochester legislative enactments on three constitutional grounds:

---

2) Warehousing and distribution centers.
3) Commercial cargo and shipping *terminals.*
4) Railroad storage and freight yards.
5) Adult book stores, adult entertainment centers, and adult film centers.

\* \* \* \* \* \*

Section 3. This ordinance shall take effect immediately.

**6.** Ordinance No. 80–199 states:

PROHIBITING ROLL–ON/ROLL–OFF TRAILER SHIP SERVICE AT THE PORT OF ROCHESTER

WHEREAS, the City of Rochester owns land and facilities on the Genesee River near its mouth to Lake Ontario, constituting docks, piers, wharves, warehouses and waterways, known collectively as the Port of Rochester, and

WHEREAS, two of these warehouses and part of a third are occupied by Pittston Warehouse Corp. under a lease between Pittston and the former Rochester-Monroe County Port Authority dated January 1, 1976, and

WHEREAS, Pittston, in conjunction with Rideau Shipping Co. Ltd. and C N Marine, has in recent months proposed a roll-on/roll-off trailer ship service between Ontario and Rochester involving a minimum of 100 tractor trailers per day, and

WHEREAS, there have been numerous meetings of an informational and public nature between the proponents of this service on the one hand and City officials and residents and property owners in the area of the Port on the other hand, at which considerations for and against

the service have been presented and discussed extensively, and

WHEREAS, the members of the City Council have previously, by their public statements, made it clear that it would be their policy consensus to disallow such service, and

WHEREAS, in spite of this stated consensus, by letter dated April 17, 1980, Robert F. Chiarello, President of Pittston, announced his intent that "the roll-on/roll-off trailer ship service will commence in August of this year."

NOW THEREFORE, BE IT ORDAINED by the Common Council of the City of Rochester as follows:

Section 1. The Council hereby finds that no substantial business, commercial or maritime interests would be served by a roll-on/roll-off trailer ship service, and that the public interest would be best served by the disallowance of such service so as to avoid the dangers to safety and health of increased heavy truck traffic, air pollution and noise pollution.

Section 2. Pursuant to General City Law, Section 20(8), any shipping operation known as roll-on/roll-off trailer ship service, involving essentially the movement by land and water of tractor trailers, is hereby prohibited in and about the municipal land and facilities constituting docks, piers, wharves, warehouses and waterways, known collectively as the Port of Rochester. This ordinance shall not be construed to prevent any Port shipping of the type that had occurred historically until recent years.

Section 3. This ordinance shall take effect immediately.

(1) that they unconstitutionally interfere with foreign and interstate commerce pursuant to the commerce clause; (2) that the enactments are preempted by federal legislation; and (3) that the enactments unconstitutionally impair Pittston's leasehold rights under the contract clause of the Constitution. For the reasons hereinafter stated, the court need only address the commerce clause issues.

Concerning Resolution 80–199 which bans roll-on/roll-off trailer ship cargo shipping, the City defends the ordinance as a valid exercise of its police power to protect the environment, public health, safety, and welfare. In regard to the three River Harbor enactments (Resolution 80–22, Ordinance 80–139, and Ordinance 80–140) which ban commercial cargo and shipping terminals as well as warehouse and distribution centers, the City of Rochester contends that the zoning doctrine of prior existing use applies. This doctrine would permit Pittston to continue its operations "for as long as the lease lasts"[7] between the corporation and the City.

Thus, the City argues that the River Harbor enactments prohibit only future commercial use and do not affect Pittston, given Pittston's present status as leaseholder. Rochester contends that others seeking commercial use now banned in the River Harbor district, or presumably Pittston, should it desire to renew the lease, could seek a zoning variance from the River Harbor district prohibitions. Rochester suggests that for these reasons, the constitutional issues raised by Pittston concerning these ordinances are not now properly before the court.

A federal court's jurisdiction can be invoked only when the plaintiff has suffered "some threatened or actual injury resulting from the putatively illegal action." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Additionally,

a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm *him*, and that he personally would benefit in a tangible way from the court's intervention.

*Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975).

In analyzing conflicts between the commerce clause and state or local legislation, the United States Supreme Court has determined that "[t]he principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 37, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980). Further, the Court has concluded that

when considering the purpose of a challenged statute, this Court is not bound by "[t]he name, description or characterization given it by the legislature or the courts of the State," but will determine for itself the practical impact of the law.

*Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979), *quoting LaCoste v. Louisiana Dept. of Conservation*, 263 U.S. 545, 550, 44 S.Ct. 186, 198, 68 L.Ed. 437 (1924).

Mindful of the procedural history of this case[8] and the guidelines of the Su-

7. Lous N. Kash, Affidavit in Opposition to Motion for Summary Judgment, Paragraph 4(b), Document No. 6.

8. The United States Court of Appeals in *Pittston Warehouse Corp. v. City of Rochester*, 80–7825 (2d Cir. Table of Decisions without Published Opinions, 652 F.2d 54, 1980) stated:

Pittston Warehouse Corporation, plaintiff below, appeals from the dismissal of its complaint in the United States District Court for the Western District of New York, Harold P. Burke, J. The complaint challenged the va-

lidity, and sought to enjoin the enforcement, of ordinances adopted by the City Council of defendant City of Rochester in April 1980. One of these ordinances, creating the "R–H River Harbor District," prohibited "commercial cargo and shipping *terminals*" (emphasis in original) in an area encompassing the facilities leased by plaintiff from defendant for its "terminal, stevedoring, warehousing and shipping business." The other ordinance, di-

preme Court in analyzing the practical operation and probable effects of the challenged enactments, the City's doctrine of prior non-conforming, existing use cannot defeat the obvious constitutional issues presented for review. The court cannot ignore the uncontested facts leading up to and surrounding the passage of the River Harbor enactments nor the Rochester City Council's legislative intent that the enactments have immediate effect.[9] The City does not deny the chief probable effects of their legislation regarding commercial shipping activities in the harbor area. These are clearly stated in Ordinance 80–140: to prohibit commercial cargo and shipping *terminals* as well as warehouse and distribution centers. It is more than coincidental that this is precisely the activities which Pittston has engaged in at the Port of Rochester since 1960. In challenging these zoning practices, the facts clearly demonstrate a threatened harm to Pittston and the practical operation and probable impact of the statutes upon Pittston and those

engaging in interstate commerce at the port [10] is self-evident.

*The River Harbor Enactments*

The commerce clause of the United States Constitution provides "that Congress shall have the power to regulate commerce with Foreign nations and among the several States." Art. 1, § 8 cl. 3. Although the clause "speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the powers of the States to erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc., supra,* 447 U.S. at 35, 100 S.Ct. at 2015. This limitation is equally applicable to municipal legislation. *See, e.g., Dean Milk v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *City of Sault Ste. Marie v. International Transit Co.,* 234 U.S. 333, 34 S.Ct. 826, 58 L.Ed. 1337 (1914). Over the years, the Supreme Court has developed two standards for determining whether a state or local law comports with these principles. The Court has distin-

---

rected expressly at plaintiff, prohibited "any shipping operation known as a roll-on/roll-off trailer ship service" in the port of Rochester. The Council adopted this ordinance shortly after plaintiff announced its plans to inaugurate within a few months precisely such an operation—allegedly the only economical means of reviving shipping activities in the port.

Judge Burke dismissed the complaint summarily and without opinion, concluding simply that plaintiff had failed to state a cause of action. Pittston argues on appeal that its complaint set forth not one but several claims on which relief could be granted. It asserts that the ordinances violate the Contract Clause of the federal Constitution, art. I, § 10, by impairing the activities authorized under its lease with the city; the Commerce Clause art. I, § 8, cl. 3, by placing a direct restraint on interstate and international commerce; and the Supremacy Clause, art. VI, cl. 2, by encroaching on paramount federal policy in the regulation of commerce and navigable waterways. In addition, Pittston alleges that the ordinances constitute a denial of substantive due process and an inverse condemnation of plaintiff's property interests, in violation of the Fifth and Fourteenth Amendments; a denial of equal protection; a deprivation of constitutional rights in violation of 42 U.S.C. § 1983; and a breach of lease.

While we express no views on the merits of any of these claims, it is beyond question that substantial claims have been stated. To take but a single example, the facts alleged in the complaint, if true, suggest that the ordinances in question impose a direct and serious impediment on both interstate and international commerce. Under well established constitutional principles, regulations having even "incidental" effects on such commerce will be upheld only where a governmental unit has acted to further a "legitimate local purpose" and where the burden imposed is not "clearly excessive in relation to the putative local benefits." See *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Clearly, further proceedings—whether by trial or by an appropriate motion after development of undisputed facts—will be necessary to determine whether defendant can sustain this burden. The summary dismissal of the complaint was therefore improper.

Accordingly, the judgment of the district court is reversed and the case remanded to the district court for further proceedings.

9. Resolution 80–22, § 3; Ordinance 80–139, § 2; Ordinance 80 -140, § 3.

10. *E.g.,* Rideau Shipping Co., Ltd., CN Marine, Pittston's proposed partners in the roll-on/roll-off trailer ship service.

guished between statutes which effect "simple economic protection" from those statutes which place a more indirect burden on the free flow of interstate commerce. *Lewis v. BT Investment Managers, Inc., supra,* 447 U.S. at 36, 100 S.Ct. at 2015. Where "simple economic protectionism" is effected by state or local legislation, "a virtual *per se* rule of invalidity has been erected." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed. 475 (1978).

■ By prohibiting commercial cargo and shipping terminals and warehouse and distribution centers, the practical operation of Resolution 80–22, Ordinance 80–139, and Ordinance 80–140 is to exclude commercial cargo and shipping from the Port of Rochester. "Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination." *Puget Sound Stevedoring Co. v. State Tax Commission,* 302 U.S. 90, 92, 58 S.Ct. 72, 73, 82 L.Ed. 68 (1937). Thus, the effect of the River Harbor enactments is to halt forevermore commercial shipping at the Port of Rochester. This is outright economic isolationism and patent economic protectionism. *See Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1934). These enactments are constitutionally invalid *per se,* as "[t]he clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. *City of Philadelphia v. New Jersey, supra,* 437 U.S. at 624, 98 S.Ct. at 2535.

■ Since *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat 1, 6 L.Ed. 23 (1824), the Supreme Court has consistently held invalid state and local laws which substantially impede the free flow of interstate commerce under the commerce clause. The City of Rochester's River Harbor enactments directly block the free flow of interstate and foreign commerce by prohibiting the port to be used for commercial interstate and international shipping activities. The nation's interest in the free flow of commerce must remain paramount; it must not be burdened by parochial local legislation which seeks to halt commerce and thereby unilaterally redefine a city as an independent economic unit, separate and apart from federal polity.

The United States could not exist as a nation if each [city or state] were to have the power to forbid imports from another state, to sanction the rights of citizens to transport their goods interstate, or to discriminate as between neighboring states in admitting articles produced therein.

*Milk Control Board v. Eisenberg Farm Products,* 306 U.S. 346, 351, 59 S.Ct. 528, 530, 83 L.Ed. 752 (1939). The authority and underlying purpose for this national supremacy was stated in *Pennsylvania v. West Virginia,* 262 U.S. 553, 596, 43 S.Ct. 658, 665, 67 L.Ed. 1117 (1922).

By the Constitution, Art. I, § 8, cl. 3, the power to regulate interstate commerce is expressly committed to Congress and therefore impliedly forbidden to the States. The purpose in this is to protect commercial intercourse from invidious restraints, to prevent interference through conflicting or hostile state laws and to insure uniformity in regulation. It means that in the matter of interstate commerce we are a single nation—one and the same people. All the States have assented to it, all are alike bound by it and all are equally protected by it.

■ The use of the Port of Rochester for commercial waterborne transportation necessarily and inherently involves the use of the Genesee River, given its location. The River Harbor enactments ostensibly affect only land uses in the harbor area by prohibiting commercial cargo and shipping terminals, but as the City makes clear, "[t]he three River-Harbor enactments . . . reflect the legislative intention of the Rochester City Council that future development of the Port area promote recreational use of the river and harbor . . . ."[11] Whether the river may be used for recreational as opposed

---

11. Defendant's Affidavit of Neil Freeland, Environmental Planner, Rochester Bureau of Planning and Zoning, Department of Community Development, Paragraph 7, Document No. 20.

to commercial shipping operations is not a decision which the City Council may determine singlehandedly. As a navigable [12] waterway, the river is "deemed the 'public property of the nation, and subject to all the requisite legislation by Congress.'" *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 385, 19 L.Ed.2d 407 (1958); *Gilman v. Philadelphia*, 3 Wall 713, 725, 18 L.Ed. 96 (1866). In this respect, the river is subject to "national planning and control in the broad regulation of commerce granted the Federal Government." *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 426–27, 61 S.Ct. 291, 308–09, 85 L.Ed. 243 (1940). *See also Kaiser Aetna v. United States*, 444 U.S. 164, 173, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979).

Rochester suggests that there is a question as to whether the River Harbor enactments have had any adverse impact on commercial commerce. The City contends that the zoning ordinances are valid because the port has been inactive, characterized by the City as "defunct," since 1975. Whether the port is defunct and, as a consequence, whether the river may be used for recreational rather than commercial shipping activities by reasons of changed economic conditions affecting the flow and patterns of commerce to and from the port, still does not provide constitutional authority for the City's legislative enactments. The Supreme Court in *Economy Light v. United States*, 256 U.S. 113, 123, 41 S.Ct. 409, 413, 65 L.Ed. 847 (1921) determined that

a river having actual navigable capacity in its natural state and capable of carrying commerce among the States, is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use

according to present methods, either by reason of changed conditions or because of artificial obstructions.[13]

*The Roll-On/Roll-Off Trailer Ship Prohibition*

Rochester defends Ordinance 80–199, the ban on roll-on/roll-off trailer ship cargo, arguing that it avoids the fatal flaw of "simple economic protectionism" since it "evenhandedly" prohibits such use in intrastate as well as interstate commerce, citing as authority *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Clearly, the City Council has no jurisdiction to regulate intrastate commerce beyond its borders, but assuming that some faint possibility exists for solely intra-city trailer ship transport, the second standard of commerce clause constitutional review, as found in *Hughes v. Oklahoma, supra*, applies. Under this standard, the court inquires:

(1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Id.* 441 U.S. at 336, 99 S.Ct. at 1736, *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

The City contends that the only incidental effects here are the banning of trailer ship service and that Ordinance 80–199 provides that Pittston may continue to operate "historical" shipping operations, *i.e.*, those shipping forms and practices which existed when the last ship docked at the port in 1974. Yet, from the facts presented

**12.** From the facts presented by the parties in this case, it is axiomatic that the Genesee River is navigable where the port is located. *See also Rochester Gas and Electric Corp. v. Federal Power Commission, supra*, 377 F.2d at 597–98, concerning the extent to which the river is navigable.

**13.** Plaintiff contends that the Rochester City Council's enactments constitute an "obstruction" prohibited by the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, *et seq.* Whether an obstruction may be so broadly defined under the Act to include the City's enactments is not determined by this court.

in the record, the "incidental effect" of banning trailer ship service and cargo in actuality halts what apparently is the only viable means of commercial activity at the port. In this manner, the ordinance maintains the port's inactive status and places an impermissible barrier around the borders of the City, barring trade with Canada and inhibiting interstate commerce. *See Nippert v. City of Richmond*, 327 U.S. 416, 425, 66 S.Ct. 586, 590, 90 L.Ed. 760 (1946). The practical effect achieved by the ordinance is to discriminate against interstate and international commerce carried by ships docking at the port.

Rochester suggests that the Coastal Zone Management Act of 1972 (16 U.S.C. § 1451, *et seq.*) provides support for the zoning ordinances as a legitimate exercise of local power over the lands and waters in the coastal zone and that New York General City Law § 20(8) and § 21 grants full authority to the City to control and administer the waterfront and waterways, docks, and warehouses of the City. These statutes cannot be read so broadly as to give the City the power to ban international commerce as accomplished under Ordinance 80–199. In a case similar to the issues presented, *City of Sault Ste. Marie v. International Transit Co.*, 234 U.S. 333, 34 S.Ct. 826, 58 L.Ed. 1337 (1914), International Transit challenged a local ordinance of the City of Sault Ste. Marie, Michigan. International Transit, a Canadian corporation which operated a ferry between the two ports of Sault Ste. Marie, Michigan, and Sault Ste. Marie, Ontario, challenged the constitutionality of the Michigan city's ordinance requiring the payment of a license fee to operate between the two cities. In holding the ordinance invalid under the commerce clause, the Supreme Court said:

> If the State, or the city, may make its consent necessary, it may withhold it. The appellee, having its domicile in Canada, is engaged in commerce between Canada and the United States. At the wharf which it leases for the purpose on the American shore, it receives and lands persons and property. Has the State of Michigan the right to make this commercial intercourse a matter of local privilege, to demand that it shall not be carried on without its permission, and to exact as the price of its consent—if it chooses to give it—the payment of a license fee?
>
> This question must be answered in the negative.

*Id.* at 340, 34 S.Ct. at 827. Similarly, the City of Rochester may not make international and interstate commercial intercourse a matter of local privilege. Nor can it exact as the price of its consent—as it has chosen to give it—solely the type of port shipping as existed prior to 1975.

Accordingly, the burden then falls on the City to show the local benefits flowing from the challenged ordinance and the unavailability of non-discriminatory alternatives that would preserve local interests. *Hughes v. Oklahoma, supra*, 441 U.S. at 336, 99 S.Ct. at 1736; *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). The basis for the City's opposition to the trailer ship cargo operation is that the tractor trailers, after they have been unloaded from the ships, would use the City streets in transporting their cargo elsewhere. The City states that the proposed trucking will require the use of a thoroughfare which is located in a residential neighborhood and that passage of the trucks on this street will create noise and air pollution, traffic, and other related hazards. Thus, the City contends that these factors required the Council to ban roll-on/roll-off transportation completely. Additionally, the roll-on/roll-off service would hinder the City's desire to promote resource conservation and recreational use of the City beaches and waterfront areas.

Nevertheless, "[w]hen legislating in areas of legitimate local concern, such as environmental protection and resource conservation, States are nonetheless limited by the Commerce Clause," *Minnesota v. Clover Leaf Creamery Co., supra*, 449 U.S. at 471, 101 S.Ct. at 727, and it has long been established that a state or locality "may not

enforce any law, the necessary effect of which is to prevent, obstruct or burden interstate commerce." *LaCoste v. Louisiana Dept. of Conservation, supra*, 263 U.S. at 549, 44 S.Ct. at 187. Unlike *Minnesota v. Clover Leaf Creamery Co., supra*, as defendants have argued, the burden on interstate commerce here is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc., supra*, 397 U.S. at 142, 90 S.Ct. at 847. In *Minnesota v. Clover Leaf Creamery Co.*, the state banned the use of plastic non-returnable milk bottles, but the Court found that milk products were still able to move freely across the Minnesota border, and the packaging inconvenience was slight. *Id.*, 449 U.S. at 472, 101 S.Ct. at 728. In this case, the ordinance halts international commercial shipping and creates an "unreasonable clog upon the mobility of commerce." *Baldwin v. G.A.F. Seelig, supra*, 494 U.S. at 527, 55 S.Ct. at 502.

Defendant also suggests that *Huron Cement Co. v. Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), supports the City's authority to ban roll-on/roll-off trailer ship service. That case involved the City of Detroit's smoke-abatement ordinance and two vessels owned by Huron Cement which, while unloading cargo at the Port of Detroit, emitted smoke from their boiler stacks which, in density and duration, exceeded the municipal ordinance limitation.

The Supreme Court reviewed the issue of whether the law placed an impermissible burden on interstate commerce and found that the statute did not violate the commerce clause. In reaching this decision, the Court stated, "It has not been suggested that the local ordinance, applicable alike to 'any person, firm or corporation' within the city, discriminates against interstate commerce as such." *Id.* at 448, 80 S.Ct. at 818. A plain reading of Rochester Ordinance 80–199 clearly reveals that it is not "applicable alike to any person, firm or corporation." Rather, the ordinance is applicable only to Pittston and its partners in the proposed trailer ship transportation service. Unlike the Detroit ordinance, it is not a regulation of "general application" but is designed specifically to regulate Pittston, and as heretofore stated, the Rochester ordinance does in fact discriminate against interstate commerce as such.

The court is sensitive to the concerns of the City and the neighborhood residents regarding the flow of truck traffic and the possible effects of an active commercial port and harbor. At the same time, it has long been established that those engaging in interstate business such as Pittston must "pay their own way," *Nippert v. City of Richmond, supra*, 327 U.S. at 425, 66 S.Ct. at 590, and as the Court stated in *City of Chicago v. Atchison, Topeka & Santa Fe Railway Co.*, 357 U.S. 77, 88, 78 S.Ct. 1063, 1069, 2 L.Ed.2d 1174 (1957):

> We are fully aware that use of local streets is involved, but no one suggests that Congress cannot require the city to permit interstate commerce to pass over those streets. Of course the City retains considerable authority to regulate how transfer vehicles shall be operated. It could hardly be denied, for example, that such vehicles must obey traffic signals, speed limits and other general safety regulations. Similarly the City may ... exact reasonable fees for their use of local streets.

Finally, the pleadings and affidavits do not reveal an attempt by the City to propose non-discriminatory alternatives to the ordinance. Instead, the City's law was passed with the finding that "no substantial business or commercial maritime interests would be served by a roll-on/roll-off trailer ship service ...." This response bears the indicia of parochial economic isolationism. It is certainly not a "last ditch" effort at traffic regulation or pollution control after other non-discriminatory alternatives have proven unfeasible. *See Hughes v. Oklahoma, supra*, 441 U.S. at 338, 99 S.Ct. at 1738. Rather, it appears to be an attempt by the City to halt the trailer ship service before it begins. Such legislative approaches cannot be viewed as tolerated "incidental burdens" on interstate commerce.

For the foregoing reasons, Ordinance 80–199 is invalid as it places a significant burden on interstate commerce, prohibited under the commerce clause of the Constitution. The Rochester City Council's Resolution, 80–22, Ordinance 80–139, and Ordinance 80–140 are unconstitutional and invalid insofar as they impede or obstruct the free flow of interstate and international commerce by virtue of the commerce clause. To this extent, the City and its agents are enjoined and restrained from enforcing or implementing these enactments, and plaintiff's motion for summary judgment is granted.

So ordered.