**WOOD MARINE SERVICE, INC.**

v.

**BOARD OF COMMISSIONERS FOR the EAST JEFFERSON LEVEE DISTRICT and its individual members in their official capacity.**

Civ. A. No. 86–2179.

United States District Court, E.D. Louisiana.

Dec. 31, 1986.

Peter G. Burke, Lugenbuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for plaintiff.

Bruce G. Reed, Reed & Reed, New Orleans, La., for defendant.

Thomas P. Anzelmo, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., Michael G. Fanning, Gretna, La., for intervenor City of Harahan.

## MEMORANDUM OPINION

MENTZ, District Judge.

This matter came before the Court on the plaintiff's motion for a preliminary injunction prohibiting, enjoining and restraining the defendants and their deputies, assistants, attorneys, agents, employees, representatives, and any and all persons acting in concert or participation with defendants from restricting, hindering, limiting, or otherwise enjoining the mooring, fleeting, anchoring, cargo loading, and unloading, storage of cargoes on batture property in the Parish of Jefferson, movement of cargoes to and from said batture property and other barge and vessel operations of the plaintiff, its officers, firm, or corporations conducting such operations with the consent of plaintiff along the banks or batture of the Mississippi River in the Parish of Jefferson. By agreement of the parties an order was entered by this Court on June 5, 1986 granting a preliminary injunction enjoining the defendants from engaging in the above activities. The Court heard oral argument on Wednesday, August 13, 1986 on whether to make said injunction permanent; and having considered the motion, the response, the memoranda of counsel, the evidence and the applicable law, the Court finds that the motion is well taken and it will be granted.

Jurisdiction is conferred on the Court by virtue of 28 U.S.C. § 1331 and § 1337.

This opinion constitutes the Court's findings of facts and conclusions of law.

## FACTUAL BACKGROUND

The parties in this matter have stipulated to most of the essential facts. For the purposes of the Court's analysis herein a recitation of some of these facts is necessary, and are as follows:

The City of Harahan is located on the east bank of the Mississippi River approximately ten miles west and up river of the City of New Orleans. It is essentially residential in character with small areas of commercial and industrial usage. The City operates under a mayor-board of alderman form of government. The majority of the homes within the city limits are single family homes. The City of Harahan operates its own police department, regulatory department, recreation department, and sewerage department. It has a volunteer fire department which does have some full time civil service firemen paid by the City of Harahan.

Wood Marine Services, Inc. ("Wood"), is a corporation organized under the laws of the State of Louisiana, domiciled in the Parish of Jefferson, and is primarily engaged in maritime operations including the providing of facilities for and conducting the fleeting, mooring, loading, and unloading of vessels, the cleaning and repairing of vessels, the transport and movement to and from vessels of construction materials (including crushed limestone, sand, shells and pumped river sand), and the ownership, lease and use of land and marine equipment and facilities for the aforesaid operations and for the dredging by vessels of river sand from the Mississippi River and placement thereof on and movement from land facilities.

As part of these operations, Wood owns and leases property along the Mississippi River, including ownership of a portion of batture property ("batture"), on the left descending bank (or "eastbank") of the river. This property is bounded on the south by the river, on the north by the right of way of the state river road, downstream by the upper line of property leased for "T.L. James Sandpitts" and "Lower Pelican Fleeting", and upstream by the lower line of Colonial Country Club. This property is

within the geographical limits of the City of Harahan.

The batture has been used by Wood and by its predecessor corporations (Wood Resources, Inc. and Point Landing, Inc.), and by other owners and lessees in excess of forty (40) years for the fleeting and mooring of vessels, the loading and unloading of cargoes, and the dredging and pumping of river sand from the river and storage in and movement from sand pits.

To accommodate the City of Harahan, Wood and its predecessor corporation and other owners of the batture, at their cost and expense, constructed prior to 1970, and maintained a "haul road" along the river side toe of the levee from the batture to a ramp at "Powerline Drive" which is the lower line of the City of Harahan, thereby avoiding the use of the River Road in Harahan for trucks transporting river sand, limestone and other construction materials to and from the batture. Another ramp over the levee in the middle of the batture is located approximately in the middle of the Wood property and crosses the levee at the foot of Imperial Woods Drive, and is used primarily for cars and light trucks in connection with fleeting operations.

The main river levee is situated on the batture along the River Road and is approximately one hundred forty feet wide and over twenty-six feet high. The sand pits on the batture are surrounded by sand pit levees approximately twenty-six feet high. The distance from the riverside toe of the levee to the low water line of the river along the batture is approximately seven hundred fifty feet in the vicinity of the area used for unloading limestone from barges, which area is approximately one thousand, one hundred feet from the nearest house in the City of Harahan.

According to the stipulation submitted by the parties, if the sand dredging and storage operations are terminated, and the river sand, retention levees and roads are removed to the natural grade of the batture, all of the property would be subject to inundation by the Mississippi River on a yearly basis.

The batture is situated across the river from Avondale Shipyard and adjoins, or is in the vicinity of other properties used primarily for maritime and construction materials operations. A truck repair facility is located on River Road across the levee from the batture.

Wood and its predecessor corporations have received various licenses, permits and letters of consent with respect to the aforesaid operations, from governmental agencies.

Wood has commenced the movement of crushed limestone on barges owned by Wood or chartered from others, from mine sites on the Ohio River to the batture. The limestone is unloaded and moved to sites in Jefferson Parish for the construction of sewer lines by the Parish pursuant to federal grants, and to other construction facilities. At present, a spud barge is situated in the river along the batture. Loaded barges are moored alongside the spud barge and the crushed limestone and other construction materials are unloaded by means of a clam bucket crane and loaded onto trucks situated on the barge by means of a hopper. The cargoes are then moved by truck directly to the construction site or to a storage area on the batture, and thereafter loaded onto other trucks for movement to the construction sites. Wood has located a truck scale on its road along the lower property line.

At the time of hearing, approximately four thousand cubic yards of river sand (150 to 200 truckloads) were transported daily from the sand pits on the batture to various locations in the greater New Orleans area. Approximately twenty truck loads of limestone were moved from the batture per day, depending on the requirements at the construction site. Use of one of the three sand pits for storage of limestone and shell decreases the storage and movement of river sand from the batture.

On or about July 15, and on August 4, 1986 Bert Duplantis, a complaint inspector of the Corps of Engineers, viewed Wood's limestone operations and informed Wood

that the operations were in compliance with the Corps' regulations. From commencement of the aforesaid movement of crushed limestone, Wood has not received any complaints from other persons as to the conduct of said operations.

In the event of stoppage of the movement of limestone cargoes through the batture, Wood does not have any other facilities where the cargoes could be unloaded and transported to the construction site.

The operations of, and services provided by Wood as stated above are part of the interstate and foreign commerce of the port of New Orleans and the United States. The port of New Orleans is a vital part of the waterborne commerce of the United States and foreign nations, and it is situated at the cross roads of the Mississippi River system and the intracoastal waterway system.

Beginning in September of 1971, and continuing to date, the Parish of Jefferson, the Jefferson Parish Council, and certain of their members and representatives, together with other individuals, and the levee district, formally part of the Board of Commissioners of the Ponchartrain Levee District ("former district"), commenced a series of actions in an effort to stop, enjoin, and/or restrict the operations of Wood and its predecessor corporations. A more complete recitation of these prior actions, and the resulting litigation, will follow.

The pertinent actions which give rise to this litigation began in 1984, when, in preparation for the location of a lessee on the batture, Wood filed an application with the levee district for a "permit" for the construction and use of marine facilities and land equipment for the handling of crushed limestone and other construction materials, which were to be transported to the batture by barges from other states. The application was denied by the levee district despite requests by Wood for any reason and/or any data or other information that these operations would impair or effect the levees within the jurisdiction of the levee board.

On May 13, 1986, representatives of Wood advised the levee district that Wood intended to commence the aforesaid limestone operations at the batture. In response thereto, the representatives of Wood were advised that if they commenced said operations without a permit from, or other consent of, the levee district, and, in particular, the president thereof, would have Wood's personnel arrested. Wood thereupon sought the protection of this Court by way of requesting an injunction to restrain the defendants from taking action which would prevent Wood from performing these limestone operations.

The defendants named in the original complaint for an injunction were; (a) Board of Commissioners for the East Jefferson Levee District, (b) John L. Lauricella, individually and in his capacity as a member and president of the Levee District, (c) Frank H. Renaudin, individually and in his capacity as a member and vice president of the Levee District, (d) Robert H. Ferrara and Chris A. Louchbaum, in their capacity as members of the Levee District, and (e) I.C. Villanueva, in his capacity as superintendent of police of the Levee District.

On July 10, 1986 the City of Harahan requested and was granted permission to intervene in the above matter as a defendant. The reason for this intervention was that if the plaintiffs were successful in obtaining an injunction, the City of Harahan would be adversely affected, in that the limestone operations are alleged to be in violation of the Comprehensive Zoning Plan of the City of Harahan.

This Comprehensive Zoning Plan was adopted by the City on July 11, 1985, following over a year of study and analysis. Pertinent to this controversy is Section XII of the Comprehensive Zoning Ordinance, which bears the title *N.U. Non-Urban Batture District* which is defined as "... composed of lands that lie outside the protective levees between the crest of the Mississippi levee and the water level of the Mississippi River. Land usages permitted in this district are limited to temporary development consistent with traditional develop-

ment in these areas and will be under conditions which will reduce the possibility of flooding due to abnormal high water in the Mississippi River." Permitted uses in this area are limited to the following:

(A) Barge mooring and holding facilities.

(B) Nature or natural parks.

(C) Public and private forests, parks, parkways, wildlife, reservations or similar conversation projects.

(D) Public utility structures and land.

(E) Sand extraction, provided that the necessary safeguards are provided to protect the surrounding areas and access roadways from obnoxious or offensive odors, dust, light, noise, or vibration.

(F) Accessory uses attendant to the above uses provided no structure exceeds a maximum of one thousand square feet in any area. Boat or ship manufacture or repair is not permitted unless such repair constitutes an emergency.

### LEGAL BACKGROUND

As mentioned above, the batture lands in general, and this batture in particular have been the subject of extensive litigation in the past few decades. Although the parties submitted, and this Court agrees, that none of this litigation is directly controlling in the present dispute, it is nonetheless helpful to the Court's analysis.

In *Parish of Jefferson v. Universal Fleeting Co., Inc.,* 234 So.2d 88 (La.App. 4th Cir.1970), a dispute arose between the Parish of Jefferson and the defendant over the zoning and use of batture land which lies just up river from the batture land which is the subject of the present dispute. The Parish of Jefferson had enacted a comprehensive zoning ordinance which precluded any use of the batture for any purpose other than residential. Universal Fleeting desired to use the batture for mooring of barges, and the Parish of Jefferson sought an injunction to prevent the defendants from using the batture for such a commercial operation.

Writing for the Court of Appeal, Judge Chasez affirmed the trial court's dismissal of the injunction suit based on the fact that the zoning ordinance in question was in conflict with the Louisiana Civil Code. At that time, Article 455 read as follows:

The use of the banks of navigable rivers or streams is public; accordingly everyone has a right freely to bring his vessels to land there, to make fast the same to the trees which are there planted, to unload his vessel, to deposit his goods, to dry his nets, and the like. Nevertheless the ownership of the river banks belongs to those who possess the adjacent lands.

In addition, Article 457 read as follows:

The banks of a river or stream are understood to be that which contains it in its ordinary stay of high water; for the nature of the banks does not change, although for some cause they may be overflowed for a time.

Nevertheless on the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks.

The Court then analyzed the historical purposes to which the batture lands had been put, and the jurisprudence which had construed the legality of those uses. The Court then concluded that,

... restricting the batture uses to R–1, single family residential, was an unauthorized use of the zoning power. We base this on the well settled principle that municipalities may enact laws to supplement the state's statutes providing they do not conflict with the provision of the state law upon the same subject and providing the municipality was given subordinate authority by city charter to legislate.... The Jefferson Parish zoning ordinances may not supercede the provisions of the civil code, especially Articles 455 and 457.

The batture lands which form the subject of this dispute have likewise been the object of much prior litigation. In 1972 the former district refused to issue a permit to

Point Landing to install barge fleeting moorings, resulting in the arrest of the president of Point Landing by agents of the former district while on batture property. Point Landing filed a petition for and obtained injunctive relief in the Twenty-third Judicial District Court, Parish of St. James, Louisiana, in order to allow such installations. This injunctive relief was based, in part, on the fact that there is no requirement by law for the obtaining of a permit from the former district, now the levee district, prior to the installation and/or use of mooring facilities or other improvements, building, trailers, and equipment necessary for the handling of maritime commerce and cargoes on the batture along the Mississippi River in the Parish of Jefferson.

Shortly thereafter the former district and the Parish of Jefferson filed an action for injunctive relief in the Twenty-fourth Judicial District Court, Parish of Jefferson, against Point Landing and obtained a temporary restraining order preventing Point Landing from installing these moorings. Point Landing removed this action to this Court, Civil Action No. 72–1815 Section "I", Judge Jack M. Gordon, presiding. During the pendency of this action, the former district and parish filed a second, and identical, action in the Twenty-fourth Judicial District Court, Parish of Jefferson, and obtained a second, and identical, temporary restraining order. Point Landing again removed that action to this Court, which became Civil Action No. 72–2800, Section "I", Judge Jack M. Gordon presiding. A stipulation of dismissal without prejudice was entered on December 13, 1972, covering both actions. The stipulation provided that neither the Parish nor the former district would seek to obtain a temporary restraining order and/or otherwise to enjoin Point Landing from conducting its fleeting, barging, mooring, or related operations along the Mississippi River without giving Point Landing fifteen days written notice before the institution of such action.

On April 16, 1973, another suit was filed in the Twenty-fourth Judicial District Court, Parish of Jefferson, by defendant Lauricella, and "Water Department of the Parish of Jefferson" against Eastbank Marine Service, Inc., et al., which petition was amended on April 26, 1973 to include Point Landing as a defendant, and ordering Point Landing to show cause why it should not be ordered to stop the mooring of barges. This action was again removed to this Court and became Civil Action No. 73–1027, Section "I", Judge Jack M. Gordon presiding. The purpose of the requested injunctive relief was to prohibit barges from mooring near the intake valves that supply water to Jefferson Parish from the Mississippi River. The defendants alleged that for eleven years they had enjoyed fleeting operations as authorized by the United States Army Corps of Engineers, as well as leases from the adjoining land owners, including the Board of Commissioners of the Port of New Orleans. Point Landing, Inc., alleged that even though the Board had, on April 4, 1973, revoked its prior authorization for the mooring of barges, that federal agencies such as the Coast Guard and the United States Army Corps of Engineers controlled commerce on the Mississippi River. On November 14, 1973, Judge Gordon dismissed this case for lack of prosecution.

In May of 1973 the Jefferson Parish Council adopted Ordinance No. 11196, amended by Ordinances No. 11256 and 11470. That ordinance provided, *inter alia,* that anyone desiring to conduct operations on the batture must first secure a permit from the Parish. The ordinance also contained a series of procedures by which said permit was to be obtained as well as an appeal mechanism. The precise procedures contained in that ordinance are not relevant to the present dispute. Based upon this ordinance, representatives of Jefferson Parish attempted to prevent Point Landing from engaging in their batture operations.

Civil Action No. 78–2497 was filed July 28, 1978 by Point Landing, Inc., and Union Mechling Corporation against the Parish of Jefferson, with the Board of Commissioners of the Port of New Orleans as intervenors. Point Landing alleged that it oper-

ated tugboats and fleeting facilities along an area of the Mississippi River leased by it, which was part of the interstate commerce of the United States. A conspiracy was charged to hinder, restrict and illegally cause a stoppage of said commerce by certain illegal acts of the defendants. The Parish contended that the riparian land owners had a servitude only on the land between the river and the levee, and that the plaintiffs' operations were in attempt to take exclusive possession and to obstruct the use of this area by the public. A motion by plaintiffs for summary judgment was granted on February 28, 1979, wherein Judge Gordon held that the Jefferson Parish Ordinance "must be held to be an impermissible exercise of willful local authority on interstate commerce", citing *Huron Portland Cement Company v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). Although his opinion was not published, Judge Gordon rendered oral reasons for his decision, stating that the case did not present an issue of preemption, but rather "whether a local regulation is an undue burden on maritime activity or interstate commerce." In analyzing the constitutionality of the ordinance, the late Judge Gordon applied a three prong test. First, he found that the ordinance was not evenhanded, in that it was without any standard upon which a determination could be made on an application. Second, he concluded that the ordinance materially affected interstate commerce. And third, he found that the ordinance did not present a reasonable scheme of community regulation. It appears to this Court that what troubled Judge Gordon the most was in the lack of procedural guidelines to be followed by a party attempting to secure this permit. He stated,

> I think whenever parties seeking a permit can't find out what standard they must meet in order to be entitled to the permit, but simply must submit themselves to the unfettered discretion of a plethora of local government bodies and then not find out, ever, as in this case, what the various bodies have done, which are paramount what standards each are

applying and clearly there is nothing in the ordinance by which they can enforce their rights or even change their activities or otherwise know what standards are being applied, thus, I must conclude that the motion must be granted and therefore I will grant summary judgment. (sic)

The Court of Appeals affirmed Judge Gordon. *Point Landing, Inc., et al. v. Parish of Jefferson,* 612 F.2d 578 (5th Cir.1980).

No evidence has been presented to this Court that the Parish of Jefferson has attempted to remedy the constitutional flaws inherent in Ordinance No. 11196 since Judge Gordon's finding of unconstitutionality.

## CONCLUSIONS OF LAW

The Levee Board and the other individual defendants have filed only a general denial to the complaint of Wood Marine. No memorandum has been submitted, and at the hearing for the permanent injunction counsel for these defendants made only a token appearance. No attempt has been made to legitimate or even explain the actions of these defendants, nor to account for any basis in law or fact for their actions. In view of the foregoing, as well as the prior legal history discussed above, the Court is compelled to find against these defendants.

However, the intervention by the City of Harahan poses substantial legal issues which the Court must address. In all the proceedings herein, Harahan has taken great care to distinguish itself from the named defendants, as well as to articulate that its position is founded upon a unique legal basis. This the Court accepts, as Harahan has never been a party to the litigation involving this batture land, nor has the legitimacy of the Comprehensive Zoning Ordinance for the City of Harahan been tested in this context. Indeed, it is this ordinance which comprises the whole of the intervenor's argument, and it is there that the Court's attention must focus.

### Municipal Authority to Zone the Batture

The first inquiry which this Court must make involves the actual authority of the City of Harahan to zone the batture lands in question. It is clear to the Court that it may.

Article 6, Section 7 of the Louisiana Constitution of 1974 is the foundation from which spring the powers of local governmental units such as Harahan. Section 7 provides in pertinent part as follows:

(A) POWERS AND FUNCTIONS. Subject to and not inconsistent with this constitution, the governing authority of a local governmental subdivision which has no home rule charter or plan of government may exercise any power and perform any function necessary, requisite, or proper for the management of its affairs, not denied by its charter or by general law, if a majority of the electors voting in an election held for that purpose vote in favor of the proposition that the governing authority may exercise such general powers. Otherwise, the local governmental subdivision shall have the powers authorized by this constitution or by law.

The power of local governments is limited by Article 6, Section 9, which provides the following:

(A) LIMITATIONS. No local governmental subdivision shall (1) define and provide for the punishment of a felony; or (2) except as provided by law, enact an ordinance governing private or civil relationships.

(B) POLICE POWER NOT ABRIDGED. Notwithstanding any provision of this Article, the police power of the state shall never be abridged.

■ Much more pertinent to the issue at hand are those provisions of law which deal explicitly with municipal zoning authority. Article 6, Section 7 of the Louisiana Constitution provides the general guidelines for such municipal power:

Subject to uniform procedures established by law, a local governmental subdivision may (1) adopt regulations for land use, zoning, and historic preservation, which authority is declared to be a public purpose; (2) create commissions and districts to implement those regulations; (3) review decisions of any such commission; and (4) adopt standards for use, construction, demolition, and modification of areas and structures. Existing constitutional authority for historical preservation commissions is retained.

This provision is elaborated and enhanced by LSA R.S. 33:4721, which provides that,

For the purpose of promoting health, safety, morals or the general welfare of the community, the governing authority of all municipalities may regulate and restrict the height, number of stores, and size of structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population and the location and use of the buildings, structures, and land for trade, industry, residents, or other purposes; provided that zoning ordinances enacted by the governing authority of municipalities or the acts of the zoning commission, board of adjustment as herein provided for, or zoning administrator shall be subject to judicial review on the grounds of abuse of discretion, reasonable exercise of the police power, and excessive use of the power herein granted or the denial of the right of due process, provided, further, that the right of judicial review of a zoning ordinance shall not be limited by the foregoing.

In light of these foregoing provisions, and given the fact that the batture lands in question are within the boundaries of the City of Harahan, it is evident that zoning authority attaches to this region, provided that zoning power is not otherwise denied by law (i.e. abridging the police power of the State).

Wood Marine contends that, indeed, Harahan has been divested of this power by operation of state and federal[1] law. In

---

1. The federal claims, namely that this zoning ordinance is in violation of the Due Process and

particular, it is contended that this zoning ordinance abridges and is contrary to the police power, law, and policy of the State of Louisiana.

The plaintiff cites the Court to a series of statutes and code articles. 33 U.S.C. Section 10, derived from Act March 3, 1811, c. 46, Section 12; enunciates the policy, adopted by the State, that the Mississippi River is a public highway of commerce, and although the riparian property is privately owned, is subject to a public servitude for commerce and navigation. Indeed, La.C.C. Articles 455, 456, and 665 embody this notion.

Art. 455. Private things subject to public use

Private things may be subject to public use in accordance with law or by dedication.

Art. 456. Banks of navigable rivers or streams

The banks of navigable rivers or streams are private things that are subject to public use.

The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water. Nevertheless, when there is a levee in proximity to the water, established according to law, the levee shall form the bank.

Art. 665. Legal public servitudes

Servitudes imposed for the public or common utility, relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works.

All that relates to this kind of servitude is determined by laws or particular regulations.

Additionally, LSA R.S. 9:1102.1 and LSA R.S. 34:22 both contain provisions regulating the use of the river batture regions. They provide, in pertinent part, as follows:

§ 1102.1 Rights of riparian landowners and their lessees

A. Riparian owners and their lessees of property on navigable rivers, lakes, or streams within the limits of any deep water port commission of the state or, in the absence of any such commission, within a municipality having a population in excess of 5,000 inhabitants, shall have the right to erect and maintain on the batture or banks owned or leased by them or in the bed of the navigable river, lake, or stream adjacent to or adjoining such batture or banks, such wharfs, buildings, or improvements as may be required for the purposes of commerce, navigation, or other public purposes. However, where such owners have first obtained the consent of the governing authority of the deep water port commission, which consent each deep-water port commission is hereby authorized to grant, or of the municipality, as the case may be, to erect such wharfs, buildings, or improvements, and same are erected in conformity to the plans and specifications which have been approved by such governing authorities, those governing authorities may expropriate said wharfs, buildings or improvements when ever said improvements or the riparian front shall be required for public purposes, and the owners shall be entitled to claim compensation to the full extent of their loss. . . . In all cases, such wharfs, buildings, or improvements shall remain subject to the administration and control of the governing authorities with respect to their maintenance and the fees and charges to be exacted for the use by the public. . . .

§ 22. Construction of private wharves; consent of board; administration and maintenance

Riparian owners of property within the limits of the port of New Orleans may, with the consent of the board of commissioners of the port, and in conformity to plans and specifications approved by the board, erect and maintain on the batture

Commerce Clauses of the United States Constitution, apply more to the substance of the ordi-

nance, not the inherent power to zone, and therefore will be treated separately.

or banks owned by them, such wharves, buildings or improvements as may be required for the purposes of commerce, navigation, or other public purposes; but in all cases such wharves, buildings or improvements shall remain subject to the administration and control of the board of commissioners with respect to their maintenance and to the fees and charges to be exacted for their use by the public.[2]

Based upon these provisions, the plaintiff contends that the State has articulated a clear policy that the City of Harahan may not abridge. Wood Marine cites *City of New Orleans v. State,* 364 So.2d 1020 (1978) *reh. denied,* in support of this proposition. In that case, the City of New Orleans attempted to enjoin the State from using a state-owned facility as a prison, based upon a local zoning ordinance. This was found to be invalid. The controversy there, however, centered on local zoning as it attempted to affect *state owned* property; whereas, at present, the controversy involves privately owned property. Thus, in the present context, this case can stand only for the proposition, already adopted by this Court above, that local power cannot contradict the police power of the State.

In this regard, *Universal Fleeting, supra,* and *Kliebert Educational Trust v. Watson Marines Services, Inc.,* 454 So.2d 855 (La.App. 5th Cir.1984) are of significant importance. As previously mentioned, the court in *Universal Fleeting* invalidated a zoning ordinance which restricted batture usage to solely residential development. The court found that the *specific* limited permitted use was so restrictive as to violate the state policy.[3] It is significant that the *Universal Fleeting* court did not invalidate *all* batture zoning on a *per se* basis, but only the zoning ordinance which was inherently contradictory to the state articulated purpose of batture usage.

■ The reasoning used to reach this decision is even more compelling. It was stated that "... if any use is to be made of the batture the tying up of barges would be most logical since it is in the interest of commerce and navigation and is substantially similar to the uses contemplated and specifically guaranteed to the public in Article 455 of the Civil Code." 234 So.2d at 91. In the next sentence, the court declared that, "We may further state that the riparian owner may use the batture in any reasonable manner provided he does not seriously obstruct or impede the public use of the banks or of the stream," citing *Lake Providence Port Commission v. Bunge Corporation,* 193 So.2d 363 (La.App. 2nd Cir.1966). It logically follows that if the riparian owner can utilize his property such as not to interfere with the state policy, then a municipality can likewise zone those non-infringing usages of the property.

*Kliebert, supra,* is similarly inapplicable for the proposition asserted by the plaintiff. *Kliebert,* as it pertains to the present dispute, involves only the right of the riparian owner to use the banks of the river as being a vested right granted by the legislature. As such, the plaintiffs therein had standing to assert an action seeking to have enjoined mooring operations on the Mississippi River. LSA R.S. 9:1102 is cited as authority for the proposition that the riparian owners do have a right to utilize the batture lands for private purposes, as compared to the right of the state and the public to utilize the same land for a public purpose. In addition, *Kliebert* also acknowledges the right of various authorities to exercise concurrent jurisdiction over these regions. 454 So.2d at 859.

■ Although the terminology is admittedly confusing, what emerges from this analysis is that these batture lands are subject to two distinct controlling forces. The first is the right of the state and the

---

**2.** The batture property which is the subject of this litigation is within the limits of the Port of New Orleans, which includes Harahan.

**3.** Following this case, former Articles 455 and 457, quoted *supra,* were incorporated into present Article 456. Although the wording has been altered somewhat, the Comments to the present Article indicate the law was not changed, hence this holding is still viable.

public to utilize these lands for navigation, commerce, and other public purposes. The second is the right of the landowner to use his property for his own purposes, provided it does not adversely impact the public right.

■ A careful reading of LSA R.S. 9:1102.1 and LSA R.S. 34:1 *et seq.*, indicates that this public/private dichotomy is contemplated by, and embodied in those statutes. In this regard, the Court accepts the argument, advanced by the City of Harahan, that the purported exclusive jurisdiction of the Port of New Orleans extends only to these public usages. Jurisdiction over these batture regions is not vested in only one authority, but rather, there may be several entities exercising concurrent jurisdiction, both overlapping and distinct.[4]

Thus, the Court concludes that the City of Harahan, as an incident of the powers granted it by the state, may enact a zoning ordinance which seeks to regulate to a limited extent the batture lands within its territorial jurisdiction.

The only question remaining is whether the activity in which Wood Marine seeks to engage is itself within that authority. Although the limestone operations are certainly an incident of navigation in a general sense, it is evident that the purpose for which Wood Marine seeks to utilize its property is a purely private one. The limestone operation is in no sense a "public" activity. The Court notes with interest, (but does not rest its decision upon) the fact that absent from the record is any evidence that Wood Marine, pursuant to the above statute, sought the approval of the port commission to maintain these operations on its land.

Having passed the threshold consideration of the ability of Harahan to zone the batture, the inquiry must turn to the actual terms and effect of the zoning ordinance. Wood Marine has raised several constitutional challenges to the ordinance, and these must be addressed in turn.

### Vagueness

■ Wood Marine contends that the zoning ordinance is vague and ambiguous, in that it fails to provide the minimum standards for the application thereof. The plaintiff's principal support for its argument is the finding by Judge Gordon in *Point Landing, supra,* C.A. No. 78–2497, that the Jefferson Parish ordinance requiring the obtaining of a "permit was procedurally constitutionally infirm." Such an issue is not present in this case.

The Harahan ordinance does not contain any procedure for seeking authorization to engage in one of the permitted uses. As such, there is no procedural ambiguity present, as in *Point Landing.* Judge Gordon invalidated the permit requirement because there were no ascertainable standards.[5] This was also the situation in *Morton v. Jefferson Parish Council,* 419 So.2d 431 (La.1982), cited by the plaintiff in support of its argument, as well as *Tiber Petroleum v. Parish of Jefferson,* 391 So.2d 1178 (La.1980).

Hence, as there is no procedural requirement contained in the batture zoning ordinance, the only issue is the vagueness of the actual zoning terms. The Court agrees with the City that these terms are clear and understandable. According to the Civil Code, words are to be taken in their ordinary meaning and understood in their normal sense in connection with the context. La.C.C. Art. 14.

■ Wood Marine, in memoranda to the Court, has posed a number of hypothetical situations and queried what outcome would be reached under the ordinance. Certainly, there may be instances in which the *application* of the terms utilized may become ambiguous. This, however, does not render the statute constitutionally infirm. Rather, it is the accepted practice that, in

---

4. Such a conclusion is also implicit in Judge Gordon's *Point Landing* decision, as he was forced to reach the constitutional aspects of the ordinance in question therein.

5. Judge Gordon's opinion, quoted in part previously, is the best explanation of this decision, and needs no further elaboration.

such a circumstance, the ordinance would be strictly construed in favor of the landowner. *Henderson v. Zoning Appeals Board of Jefferson Parish,* 328 So.2d 175 (La.App. 4th Cir.1975), *cert. denied,* 331 So.2d 474. It is clear that Wood Marine's limestone operations are not allowed under the zoning ordinance. Hence, the Court concludes that, in the context of this case, the ordinance has withstood the vagueness challenge.

### The Commerce Clause

The aspect of this zoning ordinance which has received the most attention from the parties is the possible conflict with the Commerce Clause of the United States Constitution, Art I, Section 8, Cl. 3. The claim advanced by Wood Marine is that the operative effect of the Harahan ordinance is to prohibit the unloading of interstate cargoes on the batture, which is contrary to the federal policy of commerce on the river, as well as the free flow of commerce between the states.

These claims can be categorized into two distinct legal theories. The first is actually more of a Supremacy Clause or pre-emption argument than one based on the Commerce Clause, and has little merit. The plaintiff cites 33 U.S.C. § 10, which states that

"All the navigable rivers and waters in the Territories of Orleans and Louisiana shall be and forever remain public highways."

Thus, it is contended that no legislation can be enacted by the state which would interfere with these federal mandates. This exclusivity argument has been considered in prior cases, and rejected. *Cummings v. Chicago,* 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525 (1903), *Kliebert,* 454 So.2d at 859. Likewise, this argument was rejected in the *Point Landing* case.

The plaintiff's second contention has more merit, as it has been held that one of the purposes of the Commerce Clause is to prevent (or substantially limit) the ability of the states to establish barriers to the free flow of interstate trade. *Lewis v. B.T. Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). This restriction is applicable not only to the states themselves, but to local or municipal governments as well, such as Harahan. *Dean Milk v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

In the present case, the context in which the regulation under review arises is somewhat unique. Rather than seeking to directly control interstate commerce, the Harahan ordinance was formulated as part of a comprehensive zoning scheme. As such, the impact on interstate commerce is an incidental effect of the law, not its purpose. Furthermore, it is important to note that there are two ways a local law can impinge on interstate commerce. It could discriminate against interstate commerce by favoring local interests, or it could restrict the free flow of goods without regard to source. Were the ordinance in question designed solely to advance a parochial economic protectionist purpose, the Court would not hesitate to invalidate it. *Lewis v. B.T. Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). What amounts to an almost *"per se"* rule of invalidity has even been suggested for application in non-economically motivated cases. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

However, in the case at bar, it seems clear to the Court that the issue is not local protectionism, but, rather, an ordinance which presents an incidental burden on interstate commerce.[6]

In this regard, *Pittston Warehouse Corp. v. City of Rochester,* 528 F.Supp. 653 (W.D.N.Y.1981), is pertinent to the analysis in this case. Not only did the court in *Pittston Warehouse* note the two different ways that the Commerce Clause can be impacted, but the facts therein are at least superficially parallel to those at bar. In that case, the court invalidated several zoning ordinances which sought to restrict us-

---

**6.** See footnote 7, *infra.*

age of the harbor and port of Rochester, New York. Due to a demise in shipping through the port, the City of Rochester sought to rezone the area from a manufacturing-commercial district to one emphasizing recreational pursuits. Additionally, the City enacted an ordinance which expressly precluded use of the shipping method in which the plaintiff sought to engage. The court distinguished the two types of enactments, and the legal standard applicable to each.

■ The ordinances which sought to rezone the port region into a recreational and historic zone were found "unconstitutional and invalid insofar as they impede or obstruct the free flow of interstate and international commerce by virtue of the Commerce Clause" *id.* at 660. The court cited *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat 1, 6 L.Ed. 23 (1824) for the proposition that "the Supreme Court has consistently held invalid state and local laws which *substantially* impede the free flow of commerce ..." *id.* at 660. (emphasis added). The court then went on to find that:

> The City of Rochester's River Harbor enactments directly block the free flow of interstate and foreign commerce by prohibiting *the port* to be used for commercial interstate and international shipping activities. The nation's interest in the free flow of commerce must remain paramount; it must not be burdened by parochial local legislation which seeks to *halt commerce* and thereby unilaterally redefine a city as an independent economic unit, separate and apart from federal policy. *Id.* at 660, (emphasis added).

There are thus certain key distinctions between the Rochester and Harahan ordinances. Harahan is not a "port" city nor does it have harbor facilities. While it is certainly true that the Mississippi River and its banks are a commercial highway, it does not automatically follow that every square inch of batture and bank must be utilized for the transportation of commerce. This is not to suggest, however, that Harahan could withdraw its batture from that purpose. Rather, it merely acknowledges

the reality that there are alternative areas available in close proximity to Harahan which can, and *desire* to accommodate such a limestone operation. While it is true that alternatives to the use of the Harahan batture, do not *per se* validate the ordinance, the availability of these other areas is a factor which must be considered. In this regard, the Harahan and Rochester ordinances are distinguishable. Far from "blocking commerce," the Harahan ordinance does not interfere with the flow of commerce on the Mississippi River. Barge mooring and fleeting operations, for example, are permitted. What is precluded is cargo operations. Of course, if *every* city, village, county, parish or state were to enact such an ordinance, commerce, in the sense of the free flow of goods, would clearly be stifled. It is not sufficient, however, for purposes of assailing an ordinance as being in violation of the Commerce Clause, to assert what would happen if *other* jurisdictions enacted similar, or contradictory laws. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

Indeed, the only impact made on interstate commerce by the Harahan ordinance is that Wood Marine is restricted in unloading limestone. In this regard, the Harahan ordinance has had a *de minimus* impact on interstate commerce. In this respect, *Exxon Corporation v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) is controlling. Therein, the United States Supreme Court held that the Commerce Clause had not been violated merely because a statute impacts on some interstate companies or precludes one particular method of operation.

Be that as it may, this Court must still be mindful of the fact that, even though only *one* company (which is itself a resident of Louisiana) and only certain commercial operations are impacted, the Commerce Clause may yet be impermissibly infringed upon. This is particularly true in light of the sensitive attention which the Court must pay to any statute which would pur-

portedly interfere with commerce on the Mississippi River.

■ The second type of ordinance at issue in *Pittston Warehouse* was the one which precluded the use of the "roll-on/roll-off trailer ship" method of cargo operations. This ordinance was invalidated as being a burden on interstate commerce by precluding the only viable method by which interstate commerce could be achieved. As mentioned, the Harahan ordinance does not shut down commerce on the Mississippi River, nor does it totally restrict all forms of commercial operations on the batture. Further, as previously mentioned, the impact on the broad scope of interstate commerce would be miniscule if Harahan is permitted to enforce the ordinance. In sum, the factual considerations present in *Pittston Warehouse* are sufficiently diverse from those present herein that this Court cannot, without more, follow the holding of that court. However, the reasoning used to achieve that holding is most persuasive.

Having previously determined above that the purpose of the Harahan enactment was not "simple economic protection," [7] the test which must be applied is to be found in *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) and *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under this analysis, the Court must inquire:

(1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote

this local purpose as well without discriminating against interstate commerce. 441 U.S. at 336, 99 S.Ct. at 1736. In essence, this rule requires a court to balance the "putative local benefits" and the effects on interstate commerce. *A & P Tea Co. v. Cottrell*, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976).

As the Court has previously discussed, the enactment by Harahan operates evenly in regard to both intrastate and interstate commerce. In this sense, the zoning ordinance is "evenhanded" in terms of the Commerce Clause. It is unquestioned that the ordinance impacts on commerce, but whether the effects on interstate commerce are "incidental" is more troubling. While it is certainly true that the effect is incidental in the sense that it is the result of an attempt to segregate zoning uses rather than to directly impact interstate commerce, and it is likewise true that (in operation at least) there is a minimal impact on the flow of goods, it is unclear to the Court whether that is sufficient to pass constitutional muster. It is not necessary for the Court to reach this issue, in light of the latter two qualifications. Taken together, a requirement that the statute seek to address a legitimate local purpose and the availability of alternative means both reference a requirement dictating an inquiry into the *reasonableness* of the statute in question. As such, this inquiry is inextricably intertwined with the requirements for the validity of a zoning ordinance itself, and it is there that the Court will turn.

### Reasonableness of the Ordinance

In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), Justice Holmes declared that "while property may be regulated to a cer-

---

7. The Court is aware that in *Pittston Warehouse* it was found that the *per se* rule applied to an ordinance similar to the one at bar. However, it would seem that there are certain key distinctions. Rather than discriminating between intrastate and interstate commerce, the Harahan ordinance seeks to preclude all commerce of a certain type. Far from being a type of economic protectionist legislation which serves to advance local interests, the ordinance herein would impart no tangible benefits to any economic entity within Harahan. Nor does the ordinance seek to advocate the type of "ecological Balkanization" feared in *Philadelphia*. Rather, assuming the plaintiff's interpretation is correct, the legislation merely burdens interstate commerce. *See, e.g. Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Hence, the *per se* rule is inapplicable in the present context.

tain extent, if regulation goes too far it will be recognized as a taking." Indeed, most attacks on the validity of zoning enactments have been predicated on a "taking" rationale, or on the grounds that they violate the due process and equal protection clauses of the Fourteenth Amendment. *See, e.g., Euclid v. Amber Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), the Supreme Court stated a standard of review to determine the validity of the ordinance, quoting *Lawton v. Steel,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). First it must appear that "the interests of the public ... require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

Similarly, Louisiana law itself mandates that a zoning ordinance be reasonable. Indeed, LSA R.S. 33:4721, cited in full above, provides that any such regulation must be "For the purpose of promoting health, safety, morals or the general welfare of the community ..." and that such a zoning scheme shall be subject to judicial review on the basis of, but not limited to, "abuse of discretion, reasonable exercise of the police power, and excessive use of the power herein granted...." This has been construed to mean that the ordinance will be stricken if it is found to be "arbitrary or unreasonable, or that it bears no relation to the health, safety, or general welfare of the community." *Hardy v. Mayor and Board of Aldermen, City of Eunice,* 348 So.2d 143 (La.App. 3d, 1977), *writ denied,* 350 So.2d 1212. However, these ordinances are presumed valid, and the party attacking the ordinance has the burden of proof to show that it is invalid. *Four States Realty Co., Inc. v. City of Baton Rouge,* 309 So.2d 659 (La.1974).

In terms of the Commerce Clause, the ordinance must act to effectuate a *legitimate* local purpose, and that purpose must be sufficiently compelling to compensate for whatever impact exists on interstate commerce. *Pike v. Bruce Church,*

*Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). There must be *actual evidence* of the validity of the local purpose. *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), and the Court must inquire into the available alternatives to the enactments and their viability in accomplishing the same goals in a less intrusive manner. *Dean Milk Company v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). Hence, the City carries the burden of establishing the credibility of such a purpose.

Although all of these various tests are phrased differently and utilize varying standards and a shifting of the burdens of proof, the actual evidence to be reviewed is the same, and the Court will therefore consider them all simultaneously. The plaintiff has established that the ordinance in question does impinge on commerce and its rights of ownership. Unfortunately for Harahan, the record is also totally bereft of any local benefit sought, much less any evidence to substantiate the validity of any such purpose.

If the purpose of Harahan's zoning ordinance is to reduce the amount of traffic on the batture, as has been suggested, there is no evidence thereof. There is no evidence that such traffic has an adverse impact on the quality of life in Harahan. Indeed, trucks which haul sand from dredging operations (a permitted use of the batture) account for up to ten times the number of trucks as do Wood Marine's limestone operations. Furthermore, Harahan can not do indirectly what it could not do directly, *Pittston Warehouse,* 528 F.Supp. at 663, and there are certainly less intrusive and more viable means of controlling such traffic. In sum, there is simply no evidence to suggest that non-permitted uses will occasion more or less damaging traffic than the permitted ones.

If the purpose of Harahan's ordinance is to reduce the quantity of dust, noise, and vibration occurring as the result of an operation such as the limestone transport operation, there is no evidence thereof. Indeed, there is no evidence that this limestone operation, in fact, produces any of these

evils. Nor is there any evidence that such would pose a hazard to the safety or health of Harahan's citizens, or that the absence would improve the quality of life in the vicinity. The Court is compelled to note that, on evidence and testimony far more substantial than that submitted in the present case, the court in *Exton Quarries, Inc. v. Zoning Board of Adjustment*, 425 Pa. 43, 228 A.2d 169 (1967), found that limestone *quarrying* operations do not produce such evils as to warrant their exclusion.[8] Indeed, the court in *Exton Quarries* addressed many of the issues before this Court as to the impact of such a limestone operation on the community, and found the objections meritless.

If the purpose of Harahan's ordinance is to maintain the quality of life and the serenity of the adjoining neighborhoods, there is no evidence of this in the record.[9] Similarly, there is no evidence as to what, if any, evils are presented by the excluded batture usages, or how they could otherwise be addressed. Harahan has submitted into evidence a report by the Army Corps of Engineers which found that the location of a mooring facility for a midstream transfer operation would have major adverse impacts to the region. Such an operation is not at issue in the present case, and the Court will not, without further evidence, incorporate these findings into this matter.[10] Indeed, the Court is impressed with the steps taken by Wood Marine to minimize or eliminate whatever adverse effects that may exist as a result of the operations.

The Court is, however, sympathetic to the desire of Harahan to maintain the residential quality of the community which is located adjacent to this batture region. Nevertheless, Harahan can not arbitrarily and without reasonable circumspection zone this region so as to preclude opera-tions which may or may not have the impact contemplated by the City. Quite simply, there is a lack of evidence that there is a legitimate local purpose inherent in the batture zoning ordinance, much less any evidence that the ordinance is even rationally related to achieving those ends.

As such, this Court has no option but to find that the batture ordinance is arbitrary and unreasonable in its operation to exclude Wood Marine's limestone operation.

## CONCLUSION

Having found that the batture zoning ordinance is unreasonable, it is not necessary for the Court to return to the Commerce Clause balancing test. Finding that there is no legitimate local purpose, the Court cannot analyze any alternative means available to accomplish that purpose. Hence, it is axiomatic that there is nothing to be "balanced" against the impact on commerce, regardless of how minimal. Therefore, the ordinance must be held invalid insofar as it impedes the flow of such commerce.

The Court hastens to add the limited extent of its holding—what has *not* been decided herein is the validity of this, or any other ordinance, as it may pertain to the operations on the batture not at issue in this litigation. There may indeed be uses to which the property might conceivably be put which could be excluded under a zoning ordinance. The Court does not render advisory opinions, and different facts would obviously occasion a different analysis than that herein employed. This opinion should not be construed to grant Wood Marine unfettered *carte blanche* to do whatever it desires on its batture lands.

Likewise, not at issue in this litigation is any portion of the City of Harahan's Com-

---

8. While a ruling of the Pennsylvania Supreme Court is not controlling authority for this Court in this manner, the Court is nevertheless persuaded by the logic and reasoning contained therein.

9. The Court does not comment on the validity of such a purpose in terms of excluding these operations.

10. The Court is also aware that the Corps of Engineers has issued no objection to the limestone operations which form the basis of this litigation.

prehensive Zoning Ordinance, other than Section XII, *N.U. Non-Urban Batture District*, as it may pertain to Wood Marine's batture operation. Nor has the Court passed upon possible issues relating to Articles 667 and 669 of the Louisiana Civil Code.[11] It was agreed at the outset that whatever rights or remedies the City, the adjacent landowners, or the neighbors may have under these "nuisance" provisions were not before the Court in this matter.

For the foregoing reasons, Section XII of the Comprehensive Zoning Ordinance is invalid insofar as it arbitrarily and unreasonably precludes the limestone operation engaged in by Wood Marine and consequently impedes and obstructs the free flow of interstate commerce.

Accordingly, judgment will be entered in favor of the plaintiff, Wood Marine, and against the defendants and the intervenor; making permanent the previously issued preliminary injunction.

**11.** Art. 667. Limitations on use of property

Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.

Art. 669. Regulation of inconvenience

If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.